PENDLETON, President,
delivered the resolution of the Court as follows:
The ease now discharged of the question, whether the jury could find a special verdict in a writ of right, Shaw et al. v. Clements, ante. [429,] though lengthy in argument, appears to the Court to be a short and plain one.
Three patents on the 10th of June, 1740, were obtained by Thomas Jones, the father, and his two sons John the demandant and William the tenant, for 400 acres, so adjoining as to admit of being formed into one convenient tract. They were granted upon the usual condition of paying two shillings sterling a hundred annual quit-rent, and cultivating it according to law within three years; on failure of which, or the quit-rents being in arrear for three years, the grants were to be void.
*404 In January, 1746, Thomas the father, obtained ano-» ther patent for 400 acres adjoining thereto; which is the land in dispute, and which was granted upon the like conditions.
In September, 1755, these three patentees possessed of the 1600 acres of land; that is to say, the father of 800, and each son of 400, sue out what is called an inclusive patent for 2762 acres) by certain bounds comprehending the 1600 acres, (the patents for which are recited,) and 1162 acres of new land; and this patent it is agreed conveyed an estate to the three grantees as joint-tenants of the whole lands, instead of the separate interest which each had before in his individual tract. This patent was upon the like condition respecting the whole, so as to become void if the quit-rents were in arrear for three years, or if it was not cultivated within three years from the date of the patent, excepting for so much as had been improved under the former patents.
The three join in conveyances of part of the new land to Glover and Hogg; of no other consequence than that, as to the new land at least, they understood their interest to be that of joint-tenants.
Between 1766 and 1770, Thomas the father died intestate; possessed of his two patents for 800 acres, and John and William of their tracts, of 400 acres each; and John is found to be his heir at law: Who took possession of his father’s 400 acres, granted in 1740, and suffered his brother William to possess the father’s other tract patented in 1746. Of the new lands nothing is said, as to the possession. Of the other tracts the possession continued till the commencement of this suit, when John, the heir, claims the 400 acres from his brother William, insisting that his father was seised of the whole 800 acres under his old patents of a separate interest in fee, which descended to him.
William.insists that by the inclusive patent the whole 2762 acre's were conveyed as one entire tract to the three grantees as joint-tenants, and upon the death of the father survived to the two sons; that the 800 acres originally the father’s, as well as the new land was to be divided, and was so in fact, by the allotment of one tract to the demandant, and the other being the land in dispute to himself.
So, that the question between the parties is, whether as to the old lands the original separate title of each to his g^nt remained, notwithstanding the inclusive patent? Or, whether that title is merged by the acceptance of the inclu* *405 sive patent, and changed into a joint-tenancy in the whole land?
Much learning was displayed from the old books concerning the necessary circumstances to make a surrender efficacious, which after all, probably proves, that that transaction : like all other compacts, depends upon the concurring will of the parties; the one to make, and the other to accept the surrender. And in the case of the Crown, admitting that the King cannot accept a surrender in cases where, as under our laws, an estate in lands cannot pass but by deed, yet, neither that rule nor any of the English doctrines apply to the case of these patents; which depend upon our act of Assembly.
By that act, the patentee is the only actor and judge, whether he will entitle himself to the inclusive grant; he is not required to make either a surrender or conveyance to the Crown; nor had the King any agency in the transaction, except that his officers were imperatively to authenticate the new grant, when he should have entitled himself to it by the preliminary steps required. These steps have been taken; the new grant is obtained, having an effect favorable to the interest of the defendant: and laying aside the objection,- with respect to the surrender, we are to consider those arising out of the act of Assembly.
The first is, that the act is confined to one person, and cannot be extended to three'; especially as the new land, though adjoining to one of the old tracts, does not in any part adjoin to the whole. In answer to which, we cannot discover a reason, why in the case of one person authorised to take such inclusive patent, three persons whose lands adjoin, concurring in will, may not unite their interest and take in common such an inclusive patent; and as to the. other part of the objection, if it had any weight, it does not apply in this instance; since the new lands surround the four old tracts, so as that some part of them adjoin the lands of each of the old tracts.
But, then the intention of the parties is truly said to be regarded on these occasions; and it was argued to have been impossible that they could intend to relinquish their separate and individual interest in the old lands; and make them a common stock with the new.
But why impossible, or even improbable? what did they lose or gain by this effect of the new patent? The only loss suggested, was that of their priority, in case the bounds should interfere with grants posterior to the old, but prior *406 to the new grant: Which admits of two answers. First, they might be so well satisfied with the bounds as to think that circumstance of no consequence; especially, as the new lands nearly surrounded the old: and Secondly, it has been adjudged, as far as I can recollect, and I believe by this Court, that in cases of interfering bounds upon inclusive patents, lapse patents, and patents .for surplus lands, the priority shall refer to the date of the old patent, always recited in the new.
And what does the patentee gain by the new patent?
1st. A release of the forfeiture (if incurred under the former grants, either by the non-payment of quit-rents, or for want of cultivation;) being allowed three years to improve the old lands as well as the new; besides extending old improvements to save the new lands; the effect of the exception.
And when we view the relative situation of the three parties; there is nothing absurd or extraordinary in their having made this junction of their interests. Here was a father and two sons. The father in the course of nature would probably die first; and the interest devolve upon the two sons equally: Which the law of descents supposes would be his wish; and the situation of the lands will conform to his having contemplated such effect of the new patent.
His old patent of 1740 is on one side; his son John next to him, William next, and his patent of 1746 adjoining William on the other side. Upon his death he seems to have supposed that John would take the tract adjoining him, and William the other; and this was the division which took place on his death; when his sons probably knew his intention, and a pious regard to that was more operative upon John, than his interest: although, at a remote period, the latter obtained the victory and produced the suit.
Another circumstance arising from a view of the survey is, that the new lands were so situated as to make a division of them nearly equal between the sons; as they join the parts of the old, to be divided, as before mentioned.
Upon the whole, we are unanimously of opinion, that the inclusive patent fixes the title of the grantees to be that of joint-tenants, subject to all the legal effects of such an interest; and that the partition seems to have been made, in fact, *407 upon that ground. We are, therefore, for reversing the' judgment; and entering a judgment for the tenant.
Judgment reversed.