The People of the State of New York, Respondent, *v.* John R. Foote and Others, Appellants, Impleaded with Town of Hempstead, Respondent.*

Second Department, July 12, 1934.

* See 141 Misc. 409.

*Eugene R. Hurley,* for the appellants Edward B. Woodruff and John R. Foote.

*Philip Huntington [David S. Hill, Jr.,* and *Charles I. Wood* with him on the brief], for the appellant Town of Oyster Bay.

*Louis W. McKernan,* for the appellants Willis Mott Moore and others.

*Martin E. Halpin,* for the appellants George A. Bedell and others.

*William H. Bisnoff* [*Lillian M. Kooperstein* and *Moses Kooperstein* with him on the brief], for the appellants Grace M. Alling and others.

*Benjamin Kaplan,* for the appellant David Bandler.

*Charles E. Russell* [*George A. Littlejohn,* guardian *ad litem,* with him on the brief], for the appellants Evelyn Byrd and others.

*Carl S. Stern* [*John J. Bennett, Jr., Attorney-General, Walter H. Pollak, Special Assistant Attorney-General, Ruth I. Wilson* and *Raymond P. McNulty* with him on the brief], for the respondent The People of the State of New York.

*Alfred T. Davison,* for the respondent Town of Hempstead.

CARSWELL, J. This consolidated action consists of one for a declaratory judgment and two in partition. A common issue of title is involved. By stipulation, the first question litigated was whether or not the plaintiff, People of the State of New York, had title to the southern end of a tract within the easterly and westerly lines of an area known in Colonial days as " Seaman's Gore." The State having prevailed, it was unnecessary to rule upon other questions as between the individual defendants known as the " Seaman heirs." They appear by different attorneys and appeal on the judgment roll. They urge that such findings of fact as may be considered do not sustain the judgment.

The town of Hempstead is a defendant respondent. Such rights as it ever had in " Seaman's Gore " were conveyed by it to the State of New York.

The town of Oyster Bay is a defendant appellant. It claims certain beach and land under water on the easterly side of the gore, exclusive of certain beach and other land which concededly it conveyed to the State. It appeals on a case; hence the whole record is here.

This action concerns a section of land on the south shore of Long Island south of the village of Seaford. Included within it, in whole or part, is the Jones Beach State Park, on the extreme southerly side of the parcel. In the village of Seaford is the extreme northerly boundary of a tract known as John Seaman's 1,000-acre patent. The Seaman heirs claim that this patent extends southerly from Seaford to and including Jones Beach. The State asserts that the same patent does not include within it so much of the gore as contains Jones Beach on the extreme south, the land under

water from that beach to the north, that is, to the northerly shore of the Great South bay, or the hassocks or unnamed islands in the Great South bay between the two lines indicated; to all of which the State claims title. This contention leaves in Seaman and his heirs the balance of " Seaman's Gore," which constitutes the upland from the shore of the Great South bay northerly to the village of Seaford.

Aligned on one side are the State of New York, the town of Hempstead and the town of Oyster Bay, with the exception noted respecting the town of Oyster Bay.

Aligned on the other side are the so-called Seaman heirs.

The Special Term has interpreted the so-called thousand-acre patent in a way that excludes these so-called Seaman heirs and other claimants from title to the part of the gore which is in suit.

The marrow of the bone of the controversy here presented is the legal effect and true meaning of a grant made to John Seaman in 1686 by Governor Dongan. To solve the problem, certain historical facts and acts must be borne in mind. Stating them chronologically tends to ease of understanding and probable accuracy of decision.

On February 12, 1664, John Seaman, living in Hempstead, got from the Indians a deed or grant of certain property, part of which was the tract in suit. That deed had no legal value in and of itself as a source of title. (*Town of Southampton* v. *Mecox Bay Oyster Co.,* 116 N. Y. 1.) Its language is not presently important.

A month later, on March 12, 1664, Charles II, King of England, granted to his brother James, Duke of York, lands on Long Island with rights of government, which grant included the tract in suit. At this time the Crown was not in possession. This fact bears on the legality of this act of King Charles, the Dutch then being in possession.

A few months later, on August 30, 1664, New Amsterdam was surrendered by the Dutch, and on February 22, 1665, the English Crown declared war on Holland. Meanwhile · King Charles appointed one Nicolls Governor of the territory granted to the Duke of York.

On January 8, 1666, Governor Nicolls made and delivered a patent to John Seaman for the tract of land which Seaman had purchased from the Indians. We are not presently concerned with the language of that patent, except that part of it included the land in suit and gave a basis for calling the area Seaman's gore.

In June, 1668, a dispute arose involving the Nicolls patent respecting its relation to the boundary of the town of Hempstead. The matter was debated before Governor Nicolls and he made an order which confirmed boundaries as between the contestants.

At this time a state of war with Holland existed. An area on Long Island which included the land in question was retaken and reoccupied by the Dutch on July 30, 1673. The state of hostilities continued apace until February 7, 1674, when the Treaty of Westminster concluded the war. Under that treaty Long Island was ceded to the English Crown by the Netherlands.

Charles II made a new grant on June 29, 1674, to his brother James, the Duke of York. This grant covered the area described in the first grant of March 12, 1664. This was after February 7, 1674, when the area was receded to the Crown by the Netherlands, but before October 21, 1674, when the Crown in fact again took possession of Long Island.

King Charles II appointed Dongan as successor to Governor Nicolls. On February 6, 1685, the Duke of York (James) became King of England, and his charter or patent rights merged in his title as King. He continued Dongan as Governor of the territory, renewing Governor Dongan's commission on June 10, 1686. Governor Dongan and the Council of New York in 1686 declared that patents issued under the first grant to the Duke of York were insufficient and required new applications by all claimants. The patent to Seaman by Governor Nicolls, on January 8, 1666, came within that challenged class.

John Seaman then made an application to Governor Dongan for a patent covering certain lands. Seaman got a grant which it has been held adjoined the land in suit and which patent the Seaman heirs claim includes the land in suit. Governor Dongan acted on the application on December 23, 1686. He granted and confirmed the title of Seaman to certain land but concededly he did not make the grant in confirmation as broad as the grant received by Seaman from Governor Nicolls. It is the dispute respecting the scope of this grant which gives rise to this litigation.

This patent from Governor Dongan was recorded by John Seaman in the office of the Secretary of the Colony. It is the final official record of grants to Seaman claimed to include the contested part of Seaman's gore.

John Seaman lived eight years after he received the Dongan grant, which described his property on a basis less extensive than did the grant from Governor Nicolls in 1666. There is no evidence that Seaman exercised any ownership over the tract in dispute between 1686, when he got the Dongan grant, and 1694, when he died. He left a will which makes no attempt to devise the lands which the State claims were withheld from him by the Dongan grant of 1686. In this will he apportioned his domains, with great particularity, among a widow and thirteen children. None of his

heirs, from the time he died in 1694 until this litigation, claimed the land in suit belonged to John Seaman. There was some minor litigation in 1815, which concerned the town of Oyster Bay and certain Seaman heirs, and related to a part of this parcel, but it was not of benefit to the heirs.

We are not further concerned with tracing the history of the relations of the State and the two towns — Oyster Bay and Hempstead — because whatever rights these two towns had in the land within the gore were vested in the State by grants from them, exclusive of a relatively minor claim now advanced by the town of Oyster Bay. The making of these grants to the State seemingly became desirable or necessary because of certain grants from Colonial Governors to the towns as such, incidental to authorizing certain governmental functions.

One further historical record should be noted in reference to the second grant from King Charles II to his brother James. The New York Colonial Assembly, on March 8, 1773, declared the purpose of this second grant was " to remove any doubt of the validity of the Duke's title, either from the want of seizin in the Crown when it originated, or on account of the intermediate conquests by the Dutch." (Journal, General Assembly of New York [1766–1776], p. 92.)

The broad general claim of the State is that the grant to Seaman by Governor Dongan in 1686 contains the complete measure of the title of Seaman and his heirs in the area under consideration. It claims that the acceptance of that instrument precluded Seaman or his heirs from asserting title to any property under any prior instrument; that a fair interpretation of the Dongan patent reveals that none of the property in suit was granted to Seaman.

The Seaman heirs assert that the measure of John Seaman's title is the Nicolls grant in 1666, and that the acceptance of the Dongan grant did not divest title to any land which he theretofore possessed; that Seaman could not be divested of legal title to property except by a grant from him or as a consequence of adverse possession. Neither of the latter is here involved as the subject of proof or judicial ruling. They further contend that a fair interpretation of the Dongan grant and the exceptions contained therein reveals that the land in suit vested in Seaman, even under the Dongan grant.

(1) The first question is, whether or not John Seaman, by reason of applying for and taking a patent or grant from Governor Dongan in 1686, was divested of certain real property theretofore vesting in him. If such divesting of title was not effected, then the State may not prevail. (2) If it was effected, then the next question is as to the true extent and scope of the Dongan patent.

The conflict between the parties litigant on the first question grows out of a difference in approach to it. The State invokes doctrines which are peculiar to patents, while the Seaman heirs invoke doctrines which are applicable only to grants between individuals.

A grant from a sovereign to a subject is strictly construed against the grantee or subject. This is the precise opposite of the rule that prevails in grants by individuals. (*Lewis Blue Point Oyster C. Co.* v. *Briggs*, 198 N. Y. 287; affd., 229 U. S. 82; *Trustees of East Hampton* v. *Vail*, 151 N. Y. 463, 472.) This rule is enforced with more vigor where the patent is the result of an application therefor by the patentee. (*Starke-Belknap* v. *New York Central R. R. Co.*, 197 App. Div. 249, 252; affd., 234 N. Y. 630; *Langdon* v. *Mayor, etc., of City of N. Y.*, 93 id. 129, 145.)

A patent from a sovereign to a subject is to be construed more strictly in favor of the Crown than a patent by a sovereign to a town, which is to be construed liberally to effect its object, since it concerns the conferring of governmental powers as well as title to land. (*People ex rel. Howell* v. *Jessup*, 160 N. Y. 249, 259; *De Lancey* v. *Piepgras*, 138 id. 26.)

These doctrines lead reasonably to a further one: When a patentee applies for a confirmatory patent, his title thereafter depends wholly upon the terms of the confirmatory patent, even though his confirmatory grant is less in extent than that which he formerly claimed to possess under a prior grant. (*Nicoll* v. *Trustees of Huntington*, 1 Johns. Ch. 166, 183; *Town of Babylon* v. *Darling*, 207 N. Y. 651, 658; *People* v. *Livingston*, 8 Barb. 253, 297; *Jacob ex dem. Paine & Morris* v. *Smead*, 1 D. Chip. 56; *Jones* v. *Jones*, 1 Call, 458 [Va. 1798]; *Attorney-General for New South Wales* v. *Dickson*, L. R. [1904] A. C. 273.)

This effect of the acceptance of such a confirmatory patent, even though it results in a lesser grant, may be sustained on two theories: (a) the theory of surrender, and (b) the theory of estoppel.

(a) The concept underlying the theory of surrender is best stated in an early Vermont case (*Jacob ex dem. Paine & Morris* v. *Smead*, 1 D. Chip. 56 [Vt. 1791].) The land there involved was in Windsor, Vt. It had been the subject of a grant from the Royal Governor of New Hampshire, who then had jurisdiction. The territory later became subject to the jurisdiction of the Governor of New York. An application was made to him for a new charter or grant, which was accepted by the grantee. The question arose under which charter certain rights could be enforced. It was determined that the measure of rights was to be determined under the second grant. In expounding the theory of surrender the court said: " The King

was, in view of the law, the ultimate owner of all the lands within his dominions, and had the reversion in himself. An estate in fee, the highest right which a subject could have to lands, was said to be derived out of the King's right, and to be subordinate to that right.

" Agreeably to this doctrine, a surrender might be made to the King, of a former grant. On the surrender, the King was in [possession] of his former right, and might grant again as he pleased."

If one's rights under an early grant were complete and unquestioned, it is not likely that a second application for a grant covering the same area would be made. It is only when the grantee and others conclude that the first grant is invalid or enshrouded in doubt as to validity that an application is made to get a clear, undoubted and unquestioned grant from the sovereign. In such a situation " the reversion to the sovereign " is given full effect and the rights of the grantee are determined by the last grant.

This theory seems to have had New York acceptance, although not stated with the certainty and fullness of sweep needful to cover the case at bar. It has been invoked chiefly where the first grant involved indefinite descriptions, under a patent from Governor Nicolls, and the second grant, from Governor Dongan, took on greater certainty or freedom from indefiniteness. In such situations, rights were determined under the language of the second or Dongan grant. Such was the situation in *Nicoll* v. *Trustees of Huntington* (*supra*) in which Chancellor KENT wrote, and who was quoted by Judge COLLIN in *Town of Babylon* v. *Darling* (207 N. Y. 651, 658).

In the Federal courts the theory of surrender has been given effect in confirming Mexican or Spanish grants where change of sovereignty in particular areas was involved. Under certain statutes a claimant's title was not deemed complete or perfect until it had been passed on, within a prescribed time, by Federal authorities. If this was not done, or to the extent that Federal approval was withheld, the territory within the old Mexican or Spanish grants was deemed to have " reverted to the public domain." (*Yeast* v. *Pru*, 292 Fed. 598; *Tameling* v. *U. S. Freehold, etc., Co.*, 93 U. S. 644, 661; *Florida* v. *Furman*, 180 id. 402; *United States* v. *Cleveland & Colorado Cattle Co.*, 33 Fed. 323.) This is consonant with the doctrine of *Jacob ex dem. Paine & Morris* v. *Smead* (*supra*).

(b) The doctrine of estoppel leads to the same conclusion. It will be recalled that the Governor and Council of New York questioned the validity of the grants made by Governor Nicolls. This because of lack of possession of the Crown at the time of the grant and the change of sovereigns consequent upon the occupation, surrender and reoccupation by the Dutch of the area involved. When in 1686

John Seaman made his new application for a patent because of uncertainty of title, he in effect conceded that his old title under the Nicolls grant was insufficient as against the sovereign. On this premise, he is estopped to assert the contrary, after applying for and getting a new grant; that is, he is estopped to assert that his rights are other than those set out in the new grant.

This doctrine is akin to that enforced in a kindred situation (*Farnsworth* v. *Boro Oil & Gas Co.*, 216 N. Y. 40, 44). There a corporation obtained a franchise from a town board under certain conditions. It later challenged the binding effect of those conditions. It asserted that the town board had no power in the first instance to grant a franchise or impose conditions. To this situation the doctrine of estoppel was applied by CARDOZO, J., who stated: " I think the defendant is estopped to deny the binding force of its agreement. It applied to the town board for permission to lay its pipes in the highways of the town, and it received the permission for which it prayed. The privilege may be one that the board was not competent to grant, but at least it believed itself competent, and the defendant shared that belief. There was a claim of right which the defendant extinguished for a price. The board asserted the power to regulate the use of the highway and to prevent the defendant's entry. The defendant yielded to the claim and purchased the coveted consent. It received the very benefit which it sought, the opportunity to lay its mains without molestation of its possession or question of its right. * * *

" In such circumstances, the defendant will not be heard to say, while retaining possession of the highway, that the consent under which it entered was valueless and void."

The same doctrine has been enforced in other jurisdictions. (*Sir John Brett* v. *Cumberland*, Cro. Jac. 521, 522; *Mayor & Burgesses of Lyme Regis* v. *Henley*, 1 Bing. [N. C.] 222, 235.)

Therefore, under the theory of surrender as well as the doctrine of estoppel, the grant applied for by John Seaman, and given to him by Governor Dongan in 1686, measured the complete extent of his title to any lands involved in suit or adjacent thereto. The acceptance of that grant divested him of any title, questionable or otherwise, possessed by him prior to that date, and caused such land (other than that specifically identified in the later instrument as granted to him) to vest in the sovereign and to be unquestionably " at its free disposal " thereafter.

The Seaman heirs contend that certain cases preclude this result (*Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1, 9; *Town of Babylon* v. *Darling*, 207 id. 651, 654; *People* v. *Van Rensselaer*, 9 id. 291, 321). None of these cases presents any such obstacle.

In the *Southampton* case, interpretation of the Dongan grant, unrelated to extent of area, was involved. It was held that the Dongan grant merely conformed to that which was contained in the Andross grant, in respect of whether common lands vested in certain individuals as tenants in common or vested in the town as such. The court rejected the tenancy-in-common view.

In the *Babylon* case, interpretation was involved, rather than a bald question of whether a later grant covered a lesser extent than an earlier grant. The interpretation had was that indefiniteness of boundary in the earlier grant had been removed by the greater clarity of the later grant.

The *Van Rensselaer* case concerned a grant by Dongan in 1685, and a second grant by Cornbury in 1704. Each covered the same area. Whether the defendant should prevail was dependent upon whether he could sustain the validity of a provision common to both the first and second grants. The court held that since the provision in the first grant was valid, there was no need to consider the second, as the ground of attack on both was identical and, therefore, would be ineffectual as against either grant. It thus became unimportant whether rights were determined under the first or second grant.

The Seaman heirs assert that the Statute of Frauds prevents John Seaman from being divested of such title as he had under the Nicolls grant. This question is never reached in view of what has hereinbefore been stated. It seems, however, that a sovereign is not and was not subject to local or colonial laws, or laws respecting grants which would ordinarily be binding upon private individuals. The rule seems to be that a sovereign is not bound by statutes such as the Statute of Frauds under the English common law, unless the statute expressly states that the King is to be subject to them. Nor is the Crown bound by colonial statutes. (*De Lancey* v. *Piepgras*, 138 N. Y. 26, 39; Halsbury's Laws of England, vol. 27, p. 164.) Moreover, it is doubtful whether the English Statute of Frauds, enacted in 1676, was in force in the Colony of New York in 1686. (*Beers* v. *Hotchkiss*, 256 N. Y. 41, 53, 56.)

Under the theory of estoppel, the Statute of Frauds is not a defense. (*De Herques* v. *Marti*, 85 N. Y. 609, 611.) Furthermore, the Statute of Frauds would be inapplicable, as the extent of title vesting in the sovereign is to be determined as of record. The common law requires that facts concerning a grant from or surrender to the King be determined by "matter of record." (Halsbury, Laws of England, vol. 6, p. 477; Cruise, Laws of England Respecting Real Property [4th ed. 1835], vol. 5, p. 45.) Here there was a grant as a matter of record, obtained and recorded by John Seaman. This grant by Governor Dongan to Seaman in 1686 discloses that

except for what is contained in it, all other property is at the free disposal of the Crown. This instrument thus recorded by John Seaman had the effect of an instrument over the signature of John Seaman, so far as divesting his title to property in the area not included in the Dongan grant. (*Sir John Brett* v. *Cumberland, supra.*)

(2) This brings us to the scope of the language contained in the grant of Governor Dongan. The pertinent language reads:

" Now knew yee that I the said Thomas Dongan by virtue of the Power & Authority unto me Derived from & under his said Majesty and as well for & *in Consideracon of the Quitt Rent herein after reserved as of the Remainder of the recited Premissess not hereby Granted but by the said John Seamans Agreed to bee left at free Disposall for the use of his said Majesty & herein* Perticularly excepted and for Divers other Good & Lawfull Consideracons me thereunto moveing have Given Granted Released Ratified & Confirmed unto the said John Seamans his Heires & Assigns

" All & Singular the said Tract of Land & Premissess with all & every the Appurtenances except the Island of Meadow Adjoyneing to the said Land and all the Beach & Meadow Adjacent to the same lyeing & being on the farther or South side of the Bay or Sound and also *except so much Land to be Reckoned Adjoyning to the North bounds as shall be found to make the before Granted Premissess to exceed the Quantity of one thousand Acres.*"

Analyzing the instrument against the grantee pursuant to the doctrine of strict construction, and with it illumined by the historical facts, we conclude that the dominant purpose of all of its language was to carve out of the center of the Nicolls grant and give to John Seaman 1,000 acres of upland. The northerly boundary of his new grant concededly is found in the present village of Seaford, so a portion of the first grant was lopped from the northern end. This permitted Seaman to have so much of what was granted to him by Governor Nicolls (then incapable of enforcement) as equalled at least 1,000 acres of arable land and gave him such excess as would arise from the new tract extending from the north shore of the Great South bay.

When the grant was made, the only land that was of appreciable value was the arable land; at least, beach and marsh land were not comparable in value to arable land.

From the time Seaman got this patent from Governor Dongan, it has been referred to as the 1,000-acre patent, although it contains, as thus interpreted, almost 1,200 acres. The language is somewhat awkward, but the general purpose to give a full measure 1,000-acre patent to Seaman is indicated in the last phrase of the

above excerpt, where it is stated that the land granted is that " Adjoyning to the North bounds," which former northern portion was excluded, and such granted land is thus indicated as " the before Granted Premissess," which premises thus granted are " to exceed the Quantity of one thousand Acres "— which in fact it did, as it equals about 1,200 acres.

Such land north of the line in the present village of Seaford as may have been within the Nicolls grant is concededly excluded from the Dongan grant. It is concededly within the second exception, which concerns the northerly end of the tract in the Nicolls grant. The first exception relates to the southerly end of the tract in the Nicolls grant. There is partial agreement as to the first or southern exception. It is conceded that the " Island of Meadow," now called Seaman's island, is excluded and does not, under the Dongan patent, vest in Seaman. This island is close to the mainland on the northerly side of the Great South bay and partly within the easterly and westerly lines of the so-called " Seaman's Gore."

The disputed part of the first exception is " *all* the Beach & Meadow Adjacent to the same lyeing & being on the farther or South side of the Bay or Sound." The phrase " Adjacent to the same " is properly interpreted to mean " adjacent to *the said land*," meaning the main upland granted to Seaman on the north shore of the Great South bay. The same consequence flows from interpreting it to mean " adjacent to the ' Island of Meadow ' " or the south and east sides of it. The word " all " covers intervening " Beach & Meadow " and carries to and includes " Beach & Meadow " which is " on the farther or South side of the Bay," that is, Jones Beach.

The language noted clearly excluded the present Jones Beach and the intermediate hassocks and marsh or meadow and such as became islands without identifying names during the last two and a half centuries. The character of these other unnamed islands in 1686 does not appear. We may judicially notice that changes have occurred in that area by accretion and erosion; lands which were formerly hassocks, or which were formerly marsh, may have become islands. This may account for there being no mention by name of islands other than " the Island of Meadow " presently known as Seaman's island.

This view gives to the instrument's language a meaning conformable to the practical construction reflected in the conduct of the parties concerned. It properly bars Seaman from title to any of the beach and meadow land south of the northerly shore of the Great South bay.

This view leaves unconsidered the fact that the Dongan patent does not mention the land under water in the Great South bay. Such land may not, under this patent, be said to have vested in Seaman, because land under water, particularly navigable waters, is presumptively the property of the State and the burden is upon one claiming the contrary. (*Massachusetts* v. *New York*, 271 U. S. 65, 89; *Town of North Hempstead* v. *Stern*, 86 Misc. 520, 526; affd., 170 App. Div. 920; 220 N. Y. 629.) By accepting the Dongan grant, John Seaman was divested of such title, good or bad, as he had to land under water under the Nicolls patent. In order that Seaman might effectively claim that the Dongan grant gave him title to the lands under water in the Great South bay, it is essential that he or his heirs point to language in the Dongan patent expressly granting to him such lands under water. There is none adequate to this purpose.

Consequently, under the foregoing and the principle of strict construction applicable against Seaman, the title to such lands under water remained in the sovereign and the State of New York succeeded thereto.

These conclusions are reinforced by the doctrine (*Beers* v. *Hotchkiss*, 256 N. Y. 41, 48) that " Courts do not look at records with over-technical eyes after the healing acquiescence " of two and a half centuries. Here Seaman and his heirs have acquiesced in the view which gives to this Dongan grant the effect of a patent somewhat in excess of 1,000 acres, while if the view now advanced by the Seaman heirs were adopted, the so-called 1,000-acre patent would convey about 4,000 acres.

Moreover, there has been official action which confirms the holding that the State possesses the title to the land in suit.

(a) In 1691 the Colonial Assembly enacted a general confirmation of all prior patents with a five-year provision respecting claims affecting such patents. No claim was filed pursuant to that act designed to enlarge the effect of the Dongan patent to Seaman, nor was any such application made at any other period.

(b) The later grant to the Jacksons of Colonial Governor Cornbury of September 10, 1708, has the effect of recognizing the construction here adopted. That grant was the subject of controversy involving the town of Oyster Bay.

(c) Governor Moore in 1767 patented certain lands to other persons on a basis of recognition of the northern boundary of the Dongan grant to Seaman of 1686.

The situation is one in which the " rule of repose " should be given effect " with a view of quieting titles." (*Reed* v. *Farr*, 35 N. Y. 113, 117.)

We have examined the several arguments of the appellants which we do not discuss in detail. We find that they do not militate against the foregoing conclusions.

There is, however, a practice question to be considered. The Seaman heirs appeal on the judgment roll rather than upon a case which would bring up the entire record. They attempt to take technical advantage of such a form of appeal. It seems that the trial court, before the entry of judgment, corrected inadvertent notations which it had made on proposed findings submitted to it, so as to conform them to its original intention and determination as well as its action upon a different set of findings. We hold that it was within the power of the Special Term, before entry of judgment, to do that which it did by way of correcting inadvertent action. (*Corr* v. *Hoffman*, 256 N. Y. 254, 265; *Stokes* v. *Stokes*, 198 id. 301, 307.) We also hold, since the entire record is here on the appeal of one of the defendants, that this court will adopt as its findings those that sustain the judgment, and reverse such, if any there be, as do not sustain the judgment, including in the latter group any which the trial court may have inadvertently found in the first instance and subsequently corrected by later noting that they were not found. (*Corr* v. *Hoffman*, 256 N. Y. 254.)

Accordingly, we sustain the claim of title made by the State to lands in controversy and affirm the judgment, with costs. The orders are affirmed, without costs.

Present — YOUNG, HAGARTY, CARSWELL and DAVIS, JJ.; SCUDDER, J., not voting.

Judgment unanimously affirmed, with costs; orders unanimously affirmed, without costs.