CONDE NAST, INC., Plaintiff, *v.* TOWN OF NORTH HEMPSTEAD, Defendant.

Supreme Court, Nassau County, June 15, 1936.

*DeWitt, Van Aken & Moynihan* [*Macdonald DeWitt* of counsel], for the plaintiff.

*LeRoy G. Edwards* [*G. Burchard Smith* of counsel], for the defendant.

CUFF, J. Brought by authority of section 500 of the Real Property Law, this action tests the title to certain shore front property at Sands Point, Nassau county. Plaintiff not only claims title but also asserts ownership by reason of adverse possession. Defendant denies plaintiff's adverse possession, claims title in itself and seeks to eject plaintiff from the land. Such defense translates this suit into an ejectment action brought by defendant against plaintiff. (Real Prop. Law, § 504.) The burden of proof, therefore, rests upon defendant to prove its title. A jury was impaneled, but at the end of the taking of testimony counsel waived the jury.

Reaching into the Colonial era in this State, both sides traced title by an alleged unbroken chain to date. The authenticity of the numerous documents offered in evidence and their accuracy, except where witnesses have added lines, marks or labels, is not in dispute. Questions arise, however, because of incomplete descriptions and ambiguities in old patents. Each side contests the weight to be given to the other's exhibits.

The defendant town asserts a title that has its inception in the administration of William Kieft, the Dutch Governor of the " Province called New Netherland," who bestowed a patent upon the then town of Hempstead, defendant's predecessor, on November 16, 1644. (Defendant's Exhibit 26.) That was an extensive yet valid grant of land. (*Town of North Hempstead* v. *Thompson*, 115 N. Y. 635.) By that patent the Dutch Governor established a

" body politic " of about one hundred families, known as " Hempstead, Queens County." The land described in that patent, it is conceded, includes the *locus in quo* which is about seven acres of salt marshland lying between the high-water line of Long Island sound and the uplands. Eight acres of the latter are concededly owned by plaintiff. The land in dispute and land admittedly the property of plaintiff make one continuous parcel.

On April 17, 1685, Thomas Dongan, the English Governor of New York, who had succeeded Kieft, also issued a patent to " a Certaine Towne in Queens County called and known by the name of Hempstead upon Long Island." (Defendant's Exhibit 73.) This grant is known as the Dongan patent. (Defendant's Exhibit 73.) Near the end of that patent appears the following proviso: " Provided always that neither this Patent nor any thing herein Contained shall be construed or intended to the prejudice or Infringment of any Right Clayme or Pretence which his Royll Highss James Duke of Yorke &c. his Heires and Succefsors now hath or hereafter may have to * * * one Intire Peice of Land containeing seaven hundred Acres lyeing and being on Cow Neck."

The foregoing proviso forms the basis of this law suit because plaintiff maintains that its property is included within the bounds of the 700 acres therein mentioned.

Defendant's position is that it acquired title to the *locus in quo* by virtue of the Kieft patent (defendant's Exhibit 26) and never lost it. Plaintiff argues that if defendant's predecessor acquired good title to the *locus in quo* by the Kieft patent (defendant's Exhibit 26), it was lost by subsequent events. In endeavoring to show that defendant has no title to the *locus in quo*, plaintiff has adduced evidence for the purpose of proving title in itself. The theory upon which plaintiff attacks defendant's title and attempts to establish its own follows:

Admitting for the purpose of argument that the Kieft patent (defendant's Exhibit 26) gave the town title to all of Cow Neck, plaintiff contends that the town applied for and received the confirmatory Dongan patent (defendant's Exhibit 73) and as a result lost title to the 700 acres on Cow Neck excepted from that grant (defendant's Exhibit 73), and cites as authority *People* v. *Foote* (242 App. Div. 162; leave to go to Court of Appeals denied, Id. 733).

It is conceded by plaintiff that if nothing more appeared than the language above quoted from defendant's Exhibit 73, no change in title to the 700 acres would have been effected because of the indefiniteness of the exception. To give substance to that exception, plaintiff relies upon later developments. Its attorney points out that within one year after he granted the patent of 1685 to the

town (defendant's Exhibit 73), Governor Dongan gave patents for 700 acres as follows: 200 acres to Major Thomas Willett, dated April 25, 1686 (plaintiff's Exhibit 25); 200 acres to Richard Cornwall, dated November 25, 1686 (plaintiff's Exhibit 17); 100 acres to Elly Doughty, dated November 25, 1686 (plaintiff's Exhibit 19); 100 acres to Captain Thomas Hicks, dated November 25, 1686 (plaintiff's Exhibit 23); 100 acres to John Cornell, dated December 13, 1686 (plaintiff's Exhibit 21).

Could the town be divested of title to those 700 acres on Cow Neck? Under certain conditions it could. *People* v. *Foote (supra)* holds that where a patentee applies for a confirmatory grant, his title thereafter depends wholly upon the terms of the confirmatory grant, even though his confirmatory grant is less in extent than that which he formerly claimed to possess under a prior grant.

The town, not disputing the soundness of that reasoning, contends that no application was made for the Dongan patent (defendant's Exhibit 73) and that the principle enunciated in *People* v. *Foote (supra)* has no bearing upon this case.

To offset defendant's contention and to show that the town had good reason to and did apply for a confirmatory patent from Governor Dongan, plaintiff recalls from the old town records many incidents showing that possession of Cow Neck by the town, following the Kieft grant (defendant's Exhibit 26), was neither continuous, unchallenged nor definitely established. The Indians seemed reluctant to give up Cow Neck. There is evidence that they had not grown fully reconciled to the town's ownership of Cow Neck up to the time when Governor Dongan took action on April 25, 1685. (See defendant's Exhibit 73.) Exhibits offered by both sides chronicle happenings that show that the town, between November, 1644, the date of the Kieft patent (defendant's Exhibit 26), and April, 1685, the date of the Dongan patent (defendant's Exhibit 73), was not enjoying peace and quiet in its occupation of the disputed Cow Neck. (Defendant's Exhibits 51, 52, 58, 59, 60, 71, 78, 79, and plaintiff's Exhibits 2, 3, 4, 5, 13, 14, 15, 16, 76, 77 and 80.)

There appears to be no evidence to support the town's assertion that Governor Dongan thrust his patent (defendant's Exhibit 73) upon the town. With equally as much evidentiary persuasion, the plaintiff could declare that application by the town must have been made.

The record is silent on the subject of whether the Governor or the town initiated the movement that gave birth to the Dongan patent. (Defendant's Exhibit 73.) Clearly the Dongan patent (defendant's Exhibit 73) was valuable to the townspeople. It removed **every**

doubt that might have existed as to the validity of the town's title — a matter of vital consequence, the changed sovereignty and the undeveloped character of the tract. Moreover, the Dongan patent (defendant's Exhibit 73) confirmed titles of those who became, through the town, owners of land granted under the Kieft patent. (Defendant's Exhibit 26.) It will be remembered that Kieft set up " a body politic " by his patent. (That government has endured over these many years and is today one of the State's thriving municipal divisions.)

The Dongan instrument (defendant's Exhibit 73) makes the following commitment: " I doe hereby likewise Confirme and Grant unto the said Patentees and their associates * * * all the Privileges and Immunities belonging to a towne within this government." Was that not a gesture of approval by the English in 1685 of the local government established forty-one years earlier by the Dutch? That confirmation alone may have been all that the town wanted from its new overlord — the English government. Was it not very helpful to the town officials who, no doubt, were endeavoring to continue the local government?

Grants of land are not ordinarily given unless asked for. Certainly land was not thrust upon people by the early Colonial Governors of this State. They parceled it out with great care and some precision to their friends, although ofttimes they may have been most generous.

A meaning must be ascribed to these formal important acts of the then Governor and the then town officials. The former's act definitely removed from the ownership of the town 700 acres on Cow Neck. The latter acquiesced in the reduction of town acreage. There is no record of the town's repudiation or resistance. In *Denton* v. *Jackson* (2 Johns. Ch. 320), decided in 1817, which is 119 years nearer the event than we are today, the chancellor, holding that the common lands belonged to the town and not to certain individuals claiming them, significantly said: " The inhabitants of Hempstead held their lands under the authority of this grant, [Kieft patent, defendant's Exhibit 26] until they obtained a new patent from Governor Dongan, in 1685 [defendant's Exhibit 73] * * *. Then came the patent of Dongan, which is the foundation of their present title. It refers to the grant of the lands of the township by the former Dutch patent, and grants, ratifies, and confirms * * *" the Kieft patent (p. 326).

I feel satisfied that if Governor Dongan had been guilty of the practices that counsel for defendant attribute to him, charging in substance that he gave his patent to the town against the will of the townsmen and for purposes of his own, there would be some refer-

ence to his action in the chancellor's brief history of the patents, because at the time of the decision children of people who were living in 1685 were still alive. I think that Governor Dongan was very generous to the town. His gift was greater than Kieft's. It is far-fetched to say that he gave all of that land just to deprive the town of 700 acres on Cow Neck.

I find that the Dongan patent (defendant's Exhibit 73), granted April 17, 1685, was confirmatory of the Kieft patent (defendant's Exhibit 26) and determines the extent of the property of the town as of April 17, 1685. (*People* v. *Foote*, *supra; Denton* v. *Jackson, supra.*)

It is incumbent upon plaintiff to breathe life into the exception contained in defendant's Exhibit 73, which, without assistance, is dead because of its indefiniteness. Plaintiff attempts to do that in the following manner:

The exception describes the excepted 700 acres as being " in Cow Neck." On April 25, 1686, about one year after the Dongan patent (defendant's Exhibit 73) was issued, the same Governor Dongan granted to Major Thomas Willett 200 acres " on Cow Neck " (plaintiff's Exhibit 25). The description of the property in that patent is so indefinite that no one claims to be able to fix its lines. Plaintiff regards the patent as important in that it accounts for 200 of the 700 excepted acres and because it is adjacent to certain other grants. On November 25, 1686, the same Governor Dongan gave patents for 400 more acres " on Cow Neck " to three patentees (plaintiff's Exhibits 17, 19 and 23) and about three weeks later he issued another (plaintiff's Exhibit 21) for 100 acres " on Cow Neck." Thus, between April 25, 1686, and December 13, 1686, Governor Dongan gave five patents for land " on Cow Neck " which totaled exactly 700 acres.

It should be noted that the 700 acres granted to the aforesaid five patentees make " one Intire Peice of land   *   *   *   on Cow Neck " (defendant's Exhibit 73). Cornwall's land (this patent, plaintiff's Exhibit 17, runs to " Richard Cornwall " yet it is entitled at the top of the page " Rich'd. Cornell." Both counsel call it a " Cornwall " and I will do the same) is bounded on the south by Willett's land and the east by Doughty's. The latter's is bounded on the south by Willett's and on the west by Cornwall's. John Cornell's land is bounded on the south by Willett's and on the west by Doughty's. Hicks' land is bounded on the west by Cornwall's (meaning John, not Richard Cornwall, plaintiff's Exhibit 21). All have the sound for their north boundary except Willett whose land forms the south tier of the group.

It must be borne in mind that these five patents (plaintiff's Exhibits 17, 19, 21, 23 and 25) were executed at practically the same time. Four were based upon surveys that have survived and are in evidence (plaintiff's Exhibits 18, 20, 22 and 24), made by the same surveyor at the direction of Governor Dongan just prior to the issuance of the patents. There is no reason to believe that there was no survey for the fifth patent — Willett's (plaintiff's Exhibit 25), Counsel have informed the court that they have looked but cannot find that survey. It is evidently lost. The patent itself (plaintiff's Exhibit 25) states that the land was surveyed by order of Governor Andross. With these surveys of exactly 700 acres " on Cow Neck " before the Colonial officials, they prepared and executed the five patents. By the terms of these patents it was represented by the officials that they were granting to the patentees exactly a total of 700 acres in one piece situated " on Cow Neck." Considering that this was being done in the year following the issuance of the Dongan patent (defendant's Exhibit 73), which excepted exactly 700 acres " on Cow Neck " in one piece, the conclusion that the 700 acres in the five patents and the 700 acres referred to in the Dongan patent (defendant's Exhibit 73) are closely related, if not identical, is irresistible.

I will discuss here a point raised by the defense. Counsel say that " bounded to ye south by ye land of Major Willett " (plaintiff's Exhibit 17) and similar language found in Doughty's patent (plaintiff's Exhibit 19) means that Willett's land was somewhere to the south but not necessarily adjacent to Cornwall's and Doughty's property. I do not share that strained interpretation that violates our understanding of the same language found in numerous deeds and mortgages that we meet with daily. On the contrary, I find that the words define what is south of the Cornwall and Doughty grants and conversely establish that the Willett land is bounded on the north by Cornwall's and Doughty's property.

Because Mr. David C. Will, witness for plaintiff, frankly admitted that he was unable to place his finger on the boundaries of the land granted by the patent (plaintiff's Exhibit 25) to Major Willett and because he was unable to identify on the map the forty acres of " outs " referred to in that patent (plaintiff's Exhibit 25), counsel for the town are prone to belittle the value of this exhibit (plaintiff's Exhibit 25) in this inquiry. We glean from this exhibit information that casts a glow of light upon what the Colonial Governor was doing. He intended to give Major Willett, on April 26, 1686, 200 acres of land " on Cow Neck " not previously patented to the town.

It matters not where the forty acres of " outs," referred to in plaintiff's Exhibit 25, are located. The purpose served by this patent is to establish that the land of Major Willett is adjacent to the land granted to Cornwall and Doughty. The " outs," wherever they were located, were not in the northern part of the Willett grant (plaintiff's Exhibit 25) because the Cornwall and Doughty patents are bounded on the south by the *land* — not the " outs "— of Major Willett (plaintiff's Exhibits 17 and 19).

It would seem to me that the location of the 700 acres excepted from the Dongan patent (defendant's Exhibit 73) was known to Willett, Cornwall, Hicks, Cornell, Doughty, the Governor and the surveyors. The exception may have been made in deference to the interests of these patentees. There is evidence to support that theory. Prior to the Dongan patent (defendant's Exhibit 73), by direction of the Governor, land was surveyed for each of these men. The land surveyed was the exact land that was later patented to them. There is a survey for each parcel (plaintiff's Exhibits 18, 20, 22 and 24) except for Willett's. That Willett received the same consideration may be argued from the language of the patent (plaintiff's Exhibit 25) from which I quote: " Th greeting whereas by virtue of an Order from the Right Honorable Sr. Edmond E. Andross, formerly Governor of this Province, Js. Hobbert dated on the 10th day of March 1662/3 laye out a Certain Tract of Land on Cow Neck to the Quantitie of two hundred Acres for Major Thomas Willett."

Whether the survey was actually made does not appear but the patent would indicate that it was.

A license dated January 3, 1680, was issued to Major Thomas Willett and Captain Thomas Hicks (plaintiff's Exhibit 4) granting them leave to purchase land " on Cow Neck " from the Indians. On October 8, 1684, a deed was made by Tackapowsha Sachem, Jonas, Alias Lancike, Opsom, Sammewauck and Cungamakenake being " Indians ye true owners and propiertors of a certaine tract of land  *  *  *  on Cow Neck " (plaintiff's Exhibit 15) conveying land " on Cow Neck " to Richard Cornwall, John Cornell, Thomas Willett, Tho. Hicks and Elias Dougherty.

Does this deed, and particularly the foregoing language taken from it, not conform in a degree to plaintiff's contention that the Indians never recognized that the town had obtained title to all of Cow Neck by the Kieft patent (defendant's Exhibit 26)?

It will be observed that the Dongan patent (April 17, 1685) was issued three years after the survey (March 10, 1682) was made, that is referred to in the Willett patent (plaintiff's Exhibit 25); that the license (plaintiff's Exhibit 4) was issued January 3, 1680,

or over five years earlier than the Dongan patent (defendant's Exhibit 73), and the deed from the Indians (plaintiff's Exhibit 15) dated October 8, 1684, antedated the Dongan patent (defendant's Exhibit 73) by over six months.

That means that for a long time before Dongan made his patent (defendant's Exhibit 73) containing the 700-acre exception of land " on Cow Neck " he knew, and Cornwall, Cornell, Doughty, Willett and Hicks knew, that there was land " on Cow Neck " which did not belong to the then town of Hempstead. These men were carrying on negotiations with the Indians for certain land " on Cow Neck " under a license given by the Governor. (plaintiff's Exhibit 15.) They were surveying that land and the Governor was aiding them or at least was performing his official duties in the premises which in fact aided them in their purpose. The point is that before the Governor granted the patent (defendant's Exhibit 73) to the town on April 17, 1685, there was brought to his official attention definite information that these men wanted certain land " on Cow Neck." It cannot be assumed that they corruptly sought this land and that they knew at the time that it was the town's. Now can it be assumed that the Governor knowingly aided and abetted them in a plot to deprive the town of land that it rightfully owned? On the contrary, as a matter of law, it must be presumed that Governor Dongan in his official acts — the same being unchallenged by evidence — performed his duties properly. That means that he had no knowledge of the town's title to *all* of the land " on Cow Neck " when he authorized the license (plaintiff's Exhibit 15); when he directed the surveys (plaintiff's Exhibits 18, 20, 22 and 24); when he made the exception in his patent to the town (defendant's Exhibit 73) and when he issued the patents respectively to Cornwall, Doughty, Cornell, Hicks and Willett. (Plaintiff's Exhibits 17, 19, 21, 23 and 25.)

Still considering the question of whether or not those interested had definitely in mind the location of those 700 acres, it might be well to look into the relationship of these persons to one another. Major Thomas Willett and Captain Thomas Hicks were judges. They served as justices of the peace and judges of the General Court of Assizes. (Plaintiff's Exhibits 4 and 5.) William and Mary called Willett " a member of our Council of our Province of New Yorke." (Defendant's Exhibit 85.) Willett, Hicks, John Cornell, Doughty and Richard Cornwall are referred to in the patent issued January 5, 1693, by William and Mary (plaintiff's Exhibit 80) as " our Loving Subjects * * * of Queens County." This patent (plaintiff's Exhibit 80) confirms that these men " purchased (a certain tract of land on Cow Neck) of the Indian Natives and on

which they have made some improvements and intend to make thereon a Considerable Settlement." It will be seen, therefore, that these five men who obtained the land " on Cow Neck " by virtue of patents (plaintiff's Exhibits 17, 19, 21, 23 and 25) were not inconspicuous individuals but were people who were in the good graces of the royalty ruling the destinies of Long Island at that time. It is not at all unlikely that the 700-acre exception contained in the Dongan patent (defendant's Exhibit 73) was inserted at the instigation or for the benefit of these " loving subjects " who wanted, and actually had some definite claim to, certain land " on Cow Neck." In the face of the license (plaintiff's Exhibit 4) and the surveys (plaintiff's Exhibits 18, 20, 22, 24 and 25) ordered by the Governor (of all of which he must have had knowledge and which must have been of record in his office) could he refrain from excepting from the patent (plaintiff's Exhibit 73) that land " on Cow Neck " for which he knew his " loving subjects " were then negotiating? That is particularly true when it is considered that he was about to grant a patent embracing a vast tract extending from the sound to the ocean and that the exception (700 acres) was but an infinitesimal part of the entire grant.

Remembering that these five patents came into being at about the same time and closely followed the issuance of the patent containing the exception; the official friendship that existed with the patentees on one side and the government on the other, and recalling also that the Governor failed to describe with particularity the 700 acres excepted, I am forced to the conclusion that he knew that he would later on grant this land (the 700 acres) to these very men.

The next point in this law suit to be determined is whether or not definite lines may be established for the Richard Cornwall patent (plaintiff's Exhibit 17). The description in the patent follows exactly the description in the survey (plaintiff's Exhibit 18), and is as follows: " a Certaine Tract of Land being Scituate and lyeing on Cow Neck upon Long Island Beginning at a Redd and White oake Trees on the North side a Small Creeke knowne by the Indian name of Suckcode Creek on the West side of Long Neck and runs from thence South East and by East two Degrees and fifteene minitts Southerly forty one Chaine or one hundred sixty four Rodd to a Chesnute Tree marked with a :C: and a Crosse from thence North and by East fourer Degrees and forty five minitts Easterly ffifty five Chaines or two hundred and twenty Rodd to the Meadow thence upon the Same Line Crosse the Meadow to the Beach to the East Sid a Small Island then from the Beach Westerly as the Neck Rounds includeing the Island to the first marked trees being

Bounded to the South by the Land of Major Willett to the East by the land of Mr. Elly Doughty and to the North and West by the Sound Containeing two hundred Acres there being left for Sufficient Highwayes as by the Returne of the Survey Remaineing upon record in the Secretaryes Office Relacon being thereto may more fully and at Large Appears." (Plaintiff's Exhibit 17.)

The line begins at "a Redd and White Oake Trees." Subsequent language of the patent corrects that apparent confusion of the singular article and the plural noun when it ends the line at " the first marked Trees."

Because there is a figure on the diagram (plaintiff's Exhibit 18) which defendant calls a tree, the town urges that the " beginning " point should be that figure. Much must be disregarded if that version is to be accepted. The draftsman has placed this figure at the water's edge. That is a salt water beach. A tree would not grow there. Surely the draftsman knew that. Did he intend to depict an oak tree — red or white — with its roots in sand in which it could not possibly thrive? It is presuming beyond reason to call that figure a tree. To make it the point of beginning of the description in its singular character would be to contradict the patent which, I am satisfied, starts the boundary description of " trees " and not " a tree." Moreover, that figure is on the west edge or shore of Cow Neck. The patent begins the line " One ye North side of a Small Creeke knowne by ye Indian Name Suckcode Creeke One ye West Side of Long Neck." There is a vast difference between the west shore of Cow Neck and the north side of Suckcode creek. See the map (plaintiff's Exhibit 28) made by Mr. Will and conceded by defendant's witness, Mr. Arthur G. Archibald, to be accurate, except he says that plaintiff's property on the map is not properly " oriented." (Stenographer's minutes taken May 18, 1936, p. 29.)

I find that the point of beginning is on the north side of Suckcode creek.

The beginning line of the description follows a course and ends at " a Chesnute Tree marked with a :C: and a Crosse." No witness can find such tree.

Two lines and an angle are definitely established by the description. The one will be called the south line and the other the east line, indicating the south and east boundaries of the property granted. The courses of these lines are fixed by degrees and minutes. The length of one is definitely given while that of the other may be accurately computed. The south line is forty-one chains or 2,700 feet. The east line is fifty-five chains or 3,630 feet prolonged across a meadow to a small island, the length of which extension is not

given in the patent but may readily be ascertained by reference to the Elly Doughty patent. (Plaintiff's Exhibit 19.)

The description of this grant (the Doughty patent) starts at the chestnut tree which is the southeast corner of the Cornwall grant. (Plaintiff's Exhibit 17.) Its south line is a prolongation of the south line of the Cornwall patent. (Plaintiff's Exhibit 17.) Its east line goes northerly 4,092 feet. Its north line runs northwesterly 1,254 feet in "a straight line." It descends southward for its west line in exactly the same course (south by west four degrees and forty-five minutes westerly) as the east line of the Cornwall patent (plaintiff's Exhibit 17) and terminates at the starting point — the southeast corner of the Cornwall grant. (Plaintiff's Exhibit 17.) The Doughty west line, therefore, must coincide with the Cornwall east line because they follow the same course and end at one point. (See Plaintiff's Exhibit 28.) The length of the west line of the Doughty grant (plaintiff's Exhibit 19) is the same as the east line of the Cornwall grant (plaintiff's Exhibit 17), or 4,224 feet. It now appears that one side of the known angle is 4,224 feet and the other side 2,706 feet.

Of the few fixed points referred to in the description that may be found today, the small island in East creek is conspicuous and forms an excellent point of beginning for running the boundaries of the Cornwall patent. (Plaintiff's Exhibit 17.)

Reduce the lines of the angle formed to the scale of a map, for example plaintiff's Exhibit 98; superimpose the angle upon that map by placing the northern extremity of the east line on "the Beach to the East Sid a small Island " (plaintiff's Exhibit 17) and the western end of the south line " on the north side * * * Suckcode Creek " (plaintiff's Exhibit 17), and the southeast corner will be found to rest in the center of the stump of an old tree which is visible on the ground today, but which, as I have said, is not identified as, or as not, a chestnut tree.

The defense attempted to show that East creek at its west end connected with the sound in 1685. No evidence was offered to sustain the point. It was merely a surmise by defendant's witness, Mr. Archibald. It is scarcely worthy of comment. The reason for advancing this theory is to show that the " small island " in plaintiff's Exhibit 17 is not the one that appears on the maps (plaintiff's Exhibits 27 and 28) but that the " small island " in plaintiff's Exhibit 17 was all the land north and west of East creek which, defendant urges, was in 1685 an island but admits is not one today. That theory will not stand scrutiny. In the first place, Mr. Will says that he knows that the small island has been where it is now for thirty years. Mr. Archibald admits that an island

is in East creek but he says at high tide it is covered. Mr. Will says that he never saw water over it. There is no proof that the small island was not in East creek in 1685. If any assumption is to be made the small island cannot be ignored. Now, if Mr. Archibald's guess is correct, on the evidence before me, there were two islands in East creek. If that were so, would the surveyor not have distinguished them? He would have called one the island, or the big island, and the other the small island, in the ordinary course. If both were in East creek at the time, the surveyor's failure to designate the island or the big island in the description is evidence that his east line was not intended to terminate there and the fact that he did mention the " small island " for its termination removes all doubt as to where that east line was to end. He cast his line to the beach of the " small island "— the only small island on any theory that was in East creek — the small island that we know today. The argument of the defense on this score must fall.

Another point raised by the defense is that there is a chestnut tree on Cow Neck. The tree the town attorneys have in mind was admitted to exist by Mr. Will but he denied, without contradiction, that it was old enough to be the chestnut tree mentioned in plaintiff's Exhibit 17. Mr. Archibald admitted that the markings " :6: " and a cross were not to be found on the town chestnut tree. Nor was there any evidence on the tree that marks had ever been made upon it. But this tree could not be the tree referred to in the Cornwall grant. (Plaintiff's Exhibit 17.) If the town chestnut tree is used as the marker for the southeast corner the western end of the south line would not terminate anywhere, near the north side of Suckcode creek and the north end of the east line would pass far beyond the small island. Aside from the fact that the defense chestnut tree is insufficiently identified and that its age was not established after challenge by plaintiff, its use as a basic point must be abandoned because to employ it as such would do great violence to the rest of the description and the real landmarks referred to in the patent, and which exist today.

I think that the Cornwall grant (plaintiff's Exhibit 17) can be definitely located and that the land conveyed by it is the land outlined on plaintiff's Exhibit 28, labeled " Richard Cornwell."

There is no dispute with regard to where the *locus in quo* is. It is north of Suckcode creek on the west shore of Cow Neck. If the Cornwall patent (plaintiff's Exhibit 17) includes the so-called tail (See diagram on plaintiff's Exhibit 18 and plaintiff's Exhibits 28, 30, 74; defendant's Exhibit 84) and the land to the north, it necessarily includes the *locus in quo*. I have found that the Cornwall patent (plaintiff's Exhibit 17) embraces the tail and all land east

and north of Suckcode creek. This means that plaintiff's property is in the chain of title that began with Cornwall by reason of the patent (plaintiff's Exhibit 17) granted November 25, 1686. The town of Hempstead lost whatever claim it originally had to the property granted by the Cornwall patent (plaintiff's Exhibit 17) by reason of the issuance of the Dongan patent (defendant's Exhibit 73) and the five subsequent patents which recognized and made definite the 700-acre exception contained in the Dongan grant.

I find that plaintiff has title to the *locus in quo* by an unbroken chain commencing with the Cornwall patent. (Plaintiff's Exhibit 17.)

Counsel for the town stresses the importance of the patent by William and Mary dated March 20, 1693, granted to Colonel Thomas Willett. (Defendant's Exhibit 85.) I will quote the material part of that patent: " Whereas our Loving Subject Colonel Thomas Willett one of the Members of our Council of our Province of New Yorke &c hath by his Peticon Presented to Benjamin ffletcher our Captain Generall and Governour in Chiefe of our Province of New Yorke and Territoryes Depending thereon in America &c Prayed our Grant and Confirmation of a Certain Tract or Parcell of Land upon Cow neck upon Queens County in our Island of Nassau Containing the Quantity of two hundred Acres and being the Residue or Remainder of Seaven hundred Acres that were formerly reserved in the Grant to the Town of Hempstead the other five hundred Acres being already granted to others and the said two hundred Acres Remaining unpatented and lying next adjoyning unto the North and East Lines of the Land now in the Possession and Occupacon of our said Loving Subjects and formerly Granted to him by Sr. Edmund Androsse late Governour of our said Province of New York &c."

It is true, as defense counsel urge, that defendant's Exhibit 85 is the only document that refers to the 700-acre exception. It is also true that it confirms plaintiff to the extent that up to that date (March 20; 1693) " five hundred acres " had been " already granted to others." (Defendant's Exhibit 85.) Plaintiff has accounted for those 500 acres. (Plaintiff's Exhibits 17, 19, 21 and 23.) This patent (defendant's Exhibit 85) states that 200 of the " seven hundred acres that were formerly reserved " by the Dongan patent are " remaining unpatented." In attempting to confirm to Willett these 200 unpatented acres, it describes them as being " adjoyning unto the North and East Lines of the Land now in the Possession and Occupacon of " Willett. Defense counsel say that plaintiff's theory is undermined by that location because the 700-acre exception is " one entire piece," as defendant's Exhibit

73 says that it was and the land of Cornwall and Doughty must bound Willett's on the north. I do not fully share their view. Perhaps a part of Cornwall's land bounded Willett's on the north and, if it did, plaintiff's construction of the parcels, rearranged to meet that change, would still be "one entire piece." This patent (defendant's Exhibit 85) is very loosely drawn. No attempt was made at the trial to locate the property described in it. There was no survey. It emanated — not from a Governor nearby — but from the heads of the government across the ocean. Not only would one expect them to be less familiar with the situation but the patent demonstrates that they were. All other patents were based upon carefully prepared surveys. This one attempts to convey 200 acres remaining of the 700-acre exception without any reference to where the 200 or 500 acres are situated. I am able to give no consideration to this patent apart from its value in confirming the exception in the Dongan patent.

Likewise I find nothing helpful in the arbitration agreement (defendant's Exhibit 86) which was executed in 1701 and by which Willett seems to have given up the land that he acquired by his patent from Dongan. (Plaintiff's Exhibit 25.)

The adverse possession claim made by plaintiff is by far easier to dispose of than its title claim and somewhat supports the foregoing analysis of the early title. I am satisfied that plaintiff and plaintiff's predecessors in title have not only held this disputed seven acres openly and notoriously for more than thirty years against the world, but that the town, until very recently, made no attempt to assert its title even in the remotest way. Its counsel, who have labored earnestly and well, are unable to point to one significant act by the town indicating ownership of the land during all these years when the plaintiff and its predecessors in title were charging for removing sand, putting up fences and "no trespassing" signs; erecting at least one building and using it; constructing a board path or hedge over the creek, and improving the land by filling in the meadows with sand from the sound.

Counsel for the town, isolating these acts of ownership one by one, say that such acts will not support adverse possession. Not conceding that claim as to all of the acts, but for purposes of argument admitting it, can the same conclusion be drawn if all these acts are considered in combination, not forgetting the impressive continuity of the assertive action of plaintiff and its predecessors in possessing this land? The proof of adverse possession was offered by witnesses whose testimony was not even challenged. The reason is that it could not be disputed. It is true.

It seems incredible that the procession of town officials holding office over these many years would sit by and tolerate all of these invasions of its title, so openly and defiantly carried out, if they or any one of them thought that the town had even the slightest claim of ownership of those seven acres. On the other hand, what more or what else could plaintiff and its predecessors have done to proclaim their ownership?

Plaintiff has met all the requirements set forth in sections 37 and 38 of the Civil Practice Act. Adverse possession is established.

Plaintiff has not only proved that defendant has not title but in doing so has proved title in itself.

Motion to dismiss defendant's affirmative defense on which decision was reserved at the trial, is granted.

Judgment will be entered in favor of plaintiff.