In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title Wherever the Same Has Not Been Heretofore Acquired for the Same Purpose in Fee to the Lands, Tenements and Hereditaments Required for the Public Park Bounded by Fillmore Avenue, East Thirty-second Street, Avenue S, East Thirty-third Street, Avenue U and Stuart Street, Where Not Heretofore Acquired for Park Purposes; the Public Park Bounded by Avenue U, East Thirty-eighth Street, Pelican Street, Flatbush Avenue, the Bulkhead Line of the City of New York, the United States Pierhead and Bulkhead Line, Brigham Street, Emmons Avenue, Gerritsen Avenue, Avenue X and Burnett Street, Where Not Heretofore Acquired for Park Purposes; the Public Park Bounded by Pelican Street, Hassock Street, the Bulkhead Line of the City of New York and Flatbush Avenue; and for the Opening and Extending of East Thirty-second Street, from Fillmore Avenue to Avenue S; East Thirty-third Street, from Avenue S to Avenue U; East Thirty-eighth Street, from Avenue U to Pelican Street; Pelican Street, from East Thirty-eighth Street to Hassock Street; Hassock Street, from Pelican Street to the Bulkhead Line of the City of New York; Brigham Street, from the United States Pierhead and Bulkhead Line to Emmons Avenue; Emmons Avenue, from Brigham Street to the Westerly Highwater Line of Plumb Beach Channel, Located about 650 Feet East of Plumb Third Street; Gerritsen Avenue, from the Northerly Highwater Line of Plumb Beach Channel, Located about 4,844 Feet South of Avenue X to a Point about 223 Feet South of Avenue W; Avenue X, from Gerritsen Avenue to Burnett Street; Burnett Street, from Avenue X to Avenue U, and Stuart Street, from Avenue U to Fillmore Avenue, in the Borough of Brooklyn, City of New York.*

(GERRITSEN CREEK MARINE PARK.)

* For opinions of court below, see N. Y. L. J. July 16, 1932, p. 199; see also, Id. July 8, 1930, p. 1823; Id. May 22, 1931, p. 1040; Id. June 29, 1932, p. 3664.—[REP.

GERRITSEN BASIN DEVELOPMENT CORPORATION and THOMAS F. WHITE COMPANY, Claimants, Appellants; THE CITY OF NEW YORK, Respondent.

Second Department, June 29, 1936.

*Ralph L. Baldwin,* for the appellant Gerritsen Basin Development Corporation.

*Charles Lamb* [*Alfred J. Talley* and *James A. McKaigney* with him on the brief], for the appellant Thomas F. White Company.

*Joseph F. Mulqueen, Jr.* [*Paul Windels, Corporation Counsel, Paxton Blair* and *Philip L. Wellens* with him on the brief], for the respondent.

HAGARTY, J.   This is a condemnation proceeding instituted by the respondent, The City of New York, on the 19th day of January, 1925, for the establishment and development of a marine park in the county of Kings on both sides of a creek known as Gerritsen creek and extending from a highway on the north, known as Fillmore avenue, to the ocean or Rockaway inlet on the south. Included within this extensive territory are damage parcels of land known as Nos. 240, 279, 280, 281, 282, 283, 284, 323, 326, 328, 329 and 330 and also lands under water known as damage parcels 189, 324, and a portion of 112, title to which is claimed by appellant Gerritsen Basin Development Corporation.

The trial court has found that title to such lands and lands under water is in the respondent, The City of New York, and has made awards payable to it, with the exception of parcel 323, as to which an award has been made to an unknown owner.   The appellant, Gerritsen Basin Development Corporation, does not attack the adequacy of the awards that have been made for the parcels of land, but contends that it is entitled to them under its claim of title.   Inasmuch as the awards for lands under water are nominal, that appellant not only claims them, but contends that substantial awards should have been made.

Appellant Thomas F. White Company also claims title to damage parcels 326, 328, 329, 330 and a portion of damage parcel 112, and thus the awards as made therefor are claimed by both appellants, whose claims of title conflict.

Both appellants claim as their source of title a patent of lands known as the Hudde and Gerritsen patent, which was granted by Governor Van Twiller and the Council of New Netherlands on behalf of the West India Company in the year 1636, and which is said to have been part of the first patent issued of lands lying on Long Island.   They claim to trace the same chain of title down to the year 1835, when the claims diverge.

The claim of the appellant Gerritsen Basin Development Corporation to the damage parcels in question is an incident to a claim that embraces, roughly, all of the vast tract inclusive of salt marsh lands, islands, hassocks, etc., which lies south of a waterway comprising Gerritsen creek, Little Flat creek and Big Flat creek on the north, Gerritsen creek on the west, Jamaica bay on the east and the ocean and Rockaway inlet on the south, as at present constituted.   The appellants claim that this tract was originally included within the bounds of the Hudde and Gerritsen patent and,

in addition thereto, that that patent included Mill island and Bergen island, so called, which lie to the north of the waterway.

The respondent's claim of title arises from a patent granted to the town of Flatlands by Governor Nicolls on the 4th day of October, 1667, a confirmatory patent by Governor Dongan on the 11th day of March, 1685, and grants by the State of its interest to the islands, hummocks, hassocks, marsh and meadow lands in Jamaica bay, Rockaway inlet and tributaries thereof, by acts of 1909 and 1912 (Laws of 1909, chap. 568; Laws of 1912, chap. 522). This title would unquestionably be good if it were to be found that the lands did not pass under the Hudde and Gerritsen patent of 1636, and the respondent contends that they did not so pass.

The learned Special Term justice was of opinion that the Hudde and Gerritsen patent did not embrace the lands in question. We are constrained to disagree. That patent was one of three which undertook to grant a large tract known as the three " flats," i. e., the westernmost, middlemost and easternmost. The land conveyed as the westernmost flat was described as follows: " the Westernmost of the Flats called Keskateiuw to them belonging situated on the island called Seawanhacky between the Bays of the North River and East River of New Netherland, extending the length of a certain Kill coming from the Sea the most part Northerly till to the woods and in breadth from a certain valley (low ground) inclining the most part westerly also till to the woods."

Certain of the terms used in this description are agreed upon by the parties. The island called Seawanhacky means Long Island; the bay of the North river means the New York bay; and the bay of the East river means Jamaica bay or Canarsie bay, as it was otherwise called. The parties are also agreed that the location on the mainland of the easterly boundary was Bestaver's creek, otherwise known as the Paerdegat; of the northerly boundary, as the line which afterwards became known as the southerly line of the town of Flatbush, and of the westerly boundary, as the Stromkill or Gerritsen creek. There is some contention made by the appellant Gerritsen Basin Development Corporation that the " valley " described in the patent comprehended the marshlands in question here, but the respondent and the appellant Thomas F. White Company agree that it lay adjacent to Bestaver's creek. The other two flats, as described, were in breadth " eastward " from the valley, whereas the description of the flat in question is that it extended from that valley " inclining the most part westerly," which would indicate that it lay at the easterly boundary of the mainland. The claim of Gerritsen Basin Development Corporation is simply based upon the use of the word " valley " by the

Labadists, travelers from the Netherlands, in 1679, in describing the low flatlands toward the sea, and there is no competent proof showing any relation between the two descriptions.

The principal question in dispute is the location of the southerly bounds of the patent, the appellants claiming that it was the ocean, and that included therein, as has been stated, were all of the broken lands between the mainland and the sea, lying between the easterly and the westerly bounds, which would be, in effect, between Gerritsen creek or the Stromkill and Jamaica bay, as at present constituted. On the other hand, the city contends that the patent did not serve to convey any portion of the broken lands and that excluded from its bounds were not only the two large islands known as Bergen island and Mill island, but that part of the mainland itself which is the promontory known as Baes Jurians hook, lying between the Stromkill and Mill creek.

Surely, great natural monuments were intended to describe the bounds of this, the first patent issued of lands lying on Long Island, and not the artificial and irregular lines which the city urges as constituting the southerly boundary.

Determination of this boundary is largely dependent upon the identity of the "certain Kill coming from the Sea the most part Northerly till to the woods." The city's contention is that this kill is Bestaver's creek, which does not lead from the ocean but from Jamaica bay, which itself was named as a call or mark on the extreme east, rather than a body of water from which the kill flowed. The appellants' contention is that the kill was the Stromkill, now known as Gerritsen creek. As the kill is described as "coming from the Sea," if the sea be deemed to mean the ocean and the kill the Stromkill, then the lands included within the confines of the patent would begin at the sea or ocean itself and include the broken lands in question.

After consideration of all the claims with respect to the identity of the kill, we are of opinion that the kill in question was the Stromkill and not Bestaver's creek. The description directs our search for the "Kill coming from the Sea" to that portion of the sea which lies between Jamaica bay and New York bay. The Hubbard map of 1666 shows the Stromkill as the only kill coming from the ocean, which is thereon denominated the "sea." This map is attacked for its crudities, but it is the best evidence we have of the comprehension of the grantors as to the locality in question. To use Jamaica bay as an extreme boundary between which and another bay the flat is located, and to consider it at the same time as the "sea" from which the kill came, is a contradiction of terms.

The patent was confirmed by the English Governor Nicolls on the 1st day of November, 1667, to one Elbert Elbertson as successor in interest of Hudde and Gerritsen, in which, after a description conforming to the original, it is further stated: "That by vertue of the Commission and Authority unto mee given by his Royall Highnesse I have Ratifyed Confirmed. & Graunted And by these presents do Ratify Confirme and Graunt unto Elbert Elbertson his Heires and Assignes all the fore recited Parcell or Tract of Land Together with all the Lands Soyles Woods Meadowes fflatts Pastures Marshes Creekes Waters Lakes ffishing Hawking Hunting and ffowling And all other Proffitts Commodities Emolumts and Hereditaments to the said Parcell or Tract of Land & premisses belonging or in any wise appertaining, with their and every of their Appurtenances and of every Part and Parcell thereof."

A similar clause in a Dongan patent has been held to have been efficacious in granting salt marshes of the shore of Jamaica bay (*Best Renting Co.* v. *City of New York*, 248 N. Y. 491). It may be, as the learned trial court justice points out, that this confirmatory patent did not add anything to that already granted under the Van Twiller patent, but the inclusion, among other things, of the aforesaid " Marshes," " Creekes " and " fflatts " within the bounds of the patent is significant as to what had actually been granted under the original patent; and if, upon all of the proof, the conclusion is reached, as we think it must be, that the kill coming from the sea meant the Stromkill, then we have a fairly conclusive showing that the broken lands were included within the bounds of the patent.

In 1679, two years after the issuance of this confirmatory patent and of a patent to the town of Flatlands, it appears that cross-actions were brought by certain inhabitants of the town and Elbert Elbertson, the complaint of the former being that Elbertson " Layes claim to a certain Tract of Land " and Elbertson in turn complaining " of a Trespass That the said psons have contrary to his order put their Horses upon his Island called Bearn Island to his Damage." The matter was referred to a jury, which found for Elbertson, and so it appears that he did claim Barren Island which, fronting on the ocean, was and is, as hereinbefore set forth, the single most southerly island of the broken lands. The respondent does not question the title of Elbertson's successors to Barren Island, although all of the remainder of the broken lands intervene between it and the claimed southerly boundary, but vaguely suggests that title thereto was acquired by adverse possession and user. This adjudication and the record thereof by subsequent arbitrators, in determining a boundary dispute, negative that contention and import that title was acquired through the Hudde and Gerritsen patent.

In 1684 a dispute arose between the town of Gravesend and Elbertson as to the location of the boundaries of their joined lines, the confirmatory Lovelace patent of 1670 to the town of Gravesend describing the easterly boundary of that town as "being the Strome Kill which comes to the Marsh or fflye of Mathew Gerretsons land aforementioned." We are in agreement with the respondent that the scene of this dispute was far removed from the mouth of the kill, and that the boundary line fixed by the arbitrators as running "from the head of the Strom kill," ran from the termination of the kill and not from its mouth. The proceeding and patents subsequently issued and based thereon are important, nevertheless, in showing that the lines of Gravesend and of Elbertson's lands joined, and that the latter's lands and the patent to the town of Flatlands, to this extent at least, were identical.

After Elbertson's death, in 1688, another arbitration proceeding grew out of differences between his heirs and inhabitants of Flatlands. A vitally important finding of the arbitrators is that by the description of the kill coming from the sea in the Hudde and Gerritsen patent "is meant only the running of the Creeke almost north, and not to run almost a north line from said Kill or Creeke into the woodland." The respondent concedes that the dispute was as to the westerly boundary of the lands contained in the Hudde and Gerritsen patent. If the creek coming from the sea was important in determining this dispute and in determining whether or not the bounds were to go along the creek or to run a straight line north, then the creek was on the westerly side and was undoubtedly the Stromkill rather than Bestaver's creek which was the easterly boundary and four or five miles away. The arbitrators then point out a conveyance from Hudde and Gerritsen as lying on "the south end of the fflatts of fflatlands towne" and the adjudication in favor of Elbertson as to title to "a Certaine tract of land," apparently referring to Barren Island, and conclude that the westernmost bounds of Elbertson's patent join to the easternmost bounds of the Gravesend town patent, comprehending in its terms certain lands which were apparently in dispute. The import of this determination is that the subject of dispute was a wedge-shaped parcel of land beginning at the mouth of the Stromkill, and that the boundary of the patent ran along the creek almost north and did not run in a straight northerly line. It is certain that the arbitrators were referring to the Stromkill, and it appears that the line joined with the boundary of the Gravesend patent and ran from the ocean. We must, therefore, disagree with the learned Special Term justice that this award does not furnish any evidence that would establish the Stromkill as a boundary or as the kill referred to in the grant.

In support of its claim that the patent was restricted not only to the mainland, but that it excluded Baes Jurians hook, respondent stresses the fact that many parcels in this latter area were conveyed and granted during a period beginning approximately in the year 1661, without reference to the Hudde and Gerritsen patent. But many similar grants also took place within the conceded bounds of the patent. The significant factor of all of these patents by Governor Stuyvesant is that no source of title is shown, although the rules of the West India Company required a deed from the Indians as a source. In this connection, it must be borne in mind that the West India Company was aware of land speculation and was actively opposed to it, even going to the extent of revoking patents because of this practice. It is not unlikely, and it seems the most plausible theory, that land was sold by Hudde and Gerritsen and other patentees, but not recorded with the company, and the conveyance was made legal by procuring other patents from the Governor-General, which, however, did not recite the source of title. The arbitration agreement of 1695 recites that purchasers of parcels of the Hudde and Gerritsen lands did not have recorded deeds. In addition, there is some evidence that a fire destroyed the records of the town of Flatlands in or about the year 1675, and that no record is available as to many parcels.

One of the weakest arguments of the city involves the claim of the exclusion of Mill island from the bounds of the patent. Even its own expert was of opinion that Mill island was included therein. But, of course, if it were conceded that one large island south of the mainland was included therein, no logical reason would exist why all islands or broken lands down to the ocean or to Barren Island, where Elbertson's claim of title had been upheld, were not likewise included.

On all of the proof, a complete consideration of which would expand this opinion to an inordinate length, we are of opinion that it has been established, with reasonable certainty, that the Stromkill was the kill described in the patent and that the lands that are claimed by the appellant Gerritsen Basin Development Corporation were within its confines.

Nevertheless, it does not follow that Gerritsen Basin Development Corporation is the present owner of these lands. We have examined all of the deeds and other claimed sources of title from Elbertson down to the time of the partition of Barren Island in 1835, and find that at that time there was title in the successors of interest only to Barren Island as the single and restricted most southerly island of the broken lands, and that, with possible fragmentary exceptions, title as to the remainder of the latter had never been conveyed.

Elbert Elbertson, who had added Stoothoff to his name, died in 1688, leaving a will dated the 18th day of December, 1686, in which he devised his residuary estate, including the remainder of his lands, to his three children, Gerrit Stoothoff, Heyltie, who was the wife of one Thomas Willett, and Aegje, who was the wife of one John Tuenissen Van Duyckhuys. Although there is no written record of the conveyance, it seems that the son, Gerrit Stoothoff, acquired the third interest of his sister Aegje Van Duyckhuys, for, although Gerrit Stoothoff, Thomas Willett and John Van Duyckhuys were parties to the arbitration proceedings of 1695, only the two former parties appear as parties in a subsequent arbitration of 1705. Subsequent conveyances verify this.

Gerrit's two-thirds interest passed by his will, made on the 25th day of February, 1728, to his son, Wilhelmus Stoothoff. On the 13th day of January, 1744, Wilhelmus conveyed a half interest, not of his interest of four-sixths, but of " all the right, title & property," or three-sixths, to Johannes Lott in the undivided lands.

On the 10th day of March, 1775, Wilhelmus conveyed his remaining sixth interest in the broken lands to Rutgert Van Brunt in the identical language of an Indian conveyance to Tilton and Spicer in 1664. known as the Equindito deed, which latter admittedly served to convey no title, but also admittedly described all of the broken lands in question. In the deed to Van Brunt, however, the description " Barren Island " is added. Although it is clear that the earlier Equindito deed comprehended all of the broken lands, and that this deed generally follows the description of that one, the description recites a river running northerly and a river running westerly, which are relative terms. Their use in the Indian deed comprehended the waterway separating the mainland from the broken lands; but their use more than a century later, in conjunction with the term " Barren Island," in our opinion, related to the single restricted southerly island, as the proof is consistent and conclusive, as will hereinafter appear, that that term comprehended only such restricted island and not all of the broken lands. The subsequent chain of title out of Van Brunt of this interest and down to 1835 shows that Barren Island, alone, was conveyed, so that the question of the scope of this deed is not of prime importance.

The one-third interest which was devised by Elbertson to his daughter, Heyltie Willett, was conveyed by her husband and herself to their ten children, by deed dated the 8th day of January, 1703.

Two of these thirtieth shares, those of Abraham and John Willett, were conveyed on the 27th day of December, 1774, to Rutgert Van Brunt, who was to acquire, the following year, the one-sixth

interest of Wilhelmus Stoothoff. These deeds are of the undivided interest in "the aforesaid Island commonly called and well known by the name of Barn Island," which is a plain restriction to Barren Island.

The three-sixths share which Johannes Lott had received from Wilhelmus Stoothoff went by will, which was probated on the 2d day of May, 1775, equally among his sons, Petrus, Johannes, 2d, and Jeromus. This was of the undivided lands.

Petrus' share went to his son Johannis P. Lott by will, and from Johannis, by will, to his sons, John and Samuel. John conveyed his share to his brother Samuel, but restricted the conveyance to "the Island commonly called and known by the name of Barren Island." Samuel conveyed by the same description to Abraham Voorhees and William Dilworth, thus conveying no more than an interest in Barren island and finally, by mesne conveyances, this one-sixth or 450/2700ths restricted interest was held by Eliza Ann Voorhees on the 29th day of October, 1834.

The one-sixth interest in the undivided lands which Johannes Lott, 2d, had received passed by his will to his sons Jurrien, Hendrick, Johannes, III, and Christopher Lott. From an ancient writing of the son Hendrick I. Lott, who is named in the foregoing will and who was born in the latter part of the eighteenth century and died about the year 1840, we have an explanation of the various chains of title to the owners as constituted in 1835, and it is therein set forth that the sons of Johannes Lott, II, sold a tenth share of their 450/2700ths interest to one Jacobus Van Nuys, or 45/2700ths, or one-sixtieth thereof. This memorandum explains other shares which will be subsequently adverted to, and which found their way to Jacobus Van Nuys, but continues that this tenth share of the interest of Johannes Lott, II, was conveyed by the heirs of Jacobus Van Nuyse to Cornelius Stoothoff. There is in the record a deed from Cornelius Stoothoff to Nelson Shaw, dated the 1st day of May, 1833, which conveys the interest of the former, which is said to be a one-sixteenth part more or less; but, as the Lott memorandum points out, that is a mistake, although there were other shares that found their way into Stoothoff's hands other than the one-sixtieth shown by the Lott memorandum, as hereinafter set forth. But the description in the deed relates to Barren Island, and clearly restricts it to the single, southerly island, so that the interest consisting of the 45/2700ths share aforesaid and 720/2700ths as hereinafter set forth, thus conveyed to Nelson Shaw, was of Barren Island and nothing more.

Hendrick's three brothers conveyed to him their interest in the undivided lands on the 2d day of May, 1793, so that he held a 405/2700ths interest therein.

The one-sixth interest of the third of the three sons of Johannes Lott, I, namely, Jeromus Lott, I, passed by his will, probated the 19th day of April, 1794, to his sons Jeromus Lott, II, Johannes Lott and George Lott, and this was in the undivided lands.

Jeromus Lott, II, conveyed his eighteenth interest, or 150/2700ths, to his cousin Hendrick I. Lott by deed dated the 28th day of September, 1830, which augmented Hendrick's interest from 405/2700ths to 555/2700ths. But here again the interest conveyed is in and to Barren Island, describing the restricted island.

What happened to John Lott's eighteenth share is not a matter of record, save that the Lott memorandum gives it as the writer's opinion that John's share had been sold to a "Mr. Terhune." As will be seen later, John and Isaac Terhune appeared as parties to a partition of Barren Island, apparently as successors in interest of John Lott, but, in the absence of any adequate showing of title in the Terhunes, we do not think that title in the remainder of the broken lands can be said to have vested in them.

We have seen how the sixth share of Wilhelmus Stoothoff passed to Rutgert Van Brunt and was augmented by the two thirtieth shares of Abraham and John Willett, thus aggregating 630/2700ths. We have no deed of Rutgert Van Brunt, but are informed by the Lott memorandum that his share passed to his grandson Van Brunt Magaw, and we have a deed from the administrator of the latter's estate, dated the 25th day of January, 1833, conveying to George Lott all of Magaw's interest "in and to Barren Island." This interest, again, was only in and to Barren Island.

Thus George Lott, who was a son of Jeromus Lott, I, received 630/2700ths from Magaw, in addition to the eighteenth share or 150/2700ths from his father, which latter interest was of an undivided nature and in all of the broken lands. But one-half of the 630/2700ths that he had received from Magaw's estate he conveyed on the 1st day of May, 1833, to his cousin Hendrick Lott. The remaining interest of George Lott, amounting to 465/2700ths, passed to his estate prior to 1835, as shown by the Lott memorandum, and apparently vested in his widow, Wilhelmina Lott.

This leaves eight of the outstanding thirtieth shares acquired by the respective children of Thomas Willett to be accounted for. We have nothing of record showing devolution of their interest. We have, however, a notation in the Lott memorandum of three deeds all made in 1790 to Jacobus Van Nuys of the interest of the grantors "in Bn. Island." Assuming for the purposes of this appeal that these deeds served to convey the interests of the aforesaid eight children, the share of Van Nuys, as augmented by the one-sixtieth share received from the Lotts as aforesaid, would amount to

765/2700ths, which was conveyed, as stated, to Nelson Shaw on the 1st day of May, 1833.

So, assuming that the term "Barren Island" refers only to the single restricted southerly island, we find the title in the year 1835 in five parties, but title only in that island, with possible fragmentary exceptions in the remainder. These five parties, Peter Voorhees and wife, Isaac and John Terhune, Wilhelmina Lott, Henry I. Lott and Nelson Shaw, entered into a deed partitioning Barren Island in 1835. It is the claim of the appellant Gerritsen Basin Development Corporation that this was a partition deed of all of the broken lands, but the proof is overwhelming and conclusive that it was nothing more than a partition of the single, restricted island. The description in the deed of the tract "commonly called and known by the name of Barren Island" is as follows: "Easterly by the inlet that separates said Island from Rockaway beach Southerly by the Atlantic Ocean westerly by the inlet that separates said Island from Gravesend beach and northerly partly by the bay and by the Indian Creek (so called)." Partition was then made of that portion of Barren island east of the mouth of Duelys creek. The diagram of Hendrick Lott attached to his memorandum clearly shows that the restricted island alone was considered as being within the partition, and the above description is similar to many utilized in the foregoing chain of title. Lott writes in this memorandum: "Note. The westermost part of Barren Island, that is, all that part west of the mouth of Duelys creek to the inlet. Between said island and Gravesend beach — is yet undivided."

The sphere of partition is of that part of the island "beginning at the northeasterly corner of said Island from thence westerly partly along the Bay and partly along the Indian Creek aforesaid to the northwesterly corner of the meadows or marsh lying on the northerly side of said Island thence southerly along the bay to a certain creek commonly called Duelys Creek thence with a straight line (south eighty degrees East) to the Atlantic Ocean thence easterly along the Atlantic Ocean to the inlet that separates said Island from Rockaway beach thence northerly along said inlet to the place of beginning according to their respective shares and interest therein in manner following." Each of the five partitioners was allotted two of the ten portions into which this area was divided, the two most westerly portions being those to Nelson Shaw and Hendrick Lott. It is said that most of the lands representing the eight other portions have been washed away by erosion due to the widening of Rockaway inlet.

The claim that this deed contemplated all of the broken lands rather than the restricted island is based upon the meaning of the

northerly boundary, namely, the Indian creek and bay. If by " Indian Creek " is meant what is now known as Deep creek or Factory creek, then the partition excluded the claimed broken lands. But by reference to mainland deeds and those of Barren Island, the appellant Gerritsen Basin Development Corporation seeks to prove that the southerly boundary of the former, namely, Mill creek, Little Flat creek and Big Flat creek, conformed to this description, as did the northerly boundary of the latter, namely, " Indian Creek," so that the bay and Indian creek was the common boundary between the mainland and what was known as Barren Island as contemplating all of the broken lands, and that these terms are synonymous. We have examined all of the mainland deeds referred to and are unable to find any references that would indicate that the boundary as therein set forth is the same as " The Bay & Indian Creek " described in the 1835 partition deed as the northerly boundary of Barren Island.

That the description relates to the single island is manifest from the Lott memorandum, the rights-of-way given in the partition deed, the reference to Duelys creek, which would be an insignificant landmark if the whole vast premises were included, and other extrinsic evidence. In 1802 the State Legislature formally annexed Barren Island to the town of Flatlands (Laws of 1802, chap. 28), the act reading: " Be it enacted by the People of the State of New York, represented in Senate and Assembly, That the Island commonly called Barren-Island, in Kings county, lying on the south side of the town of Flatlands, bounded easterly by the inlet which separates it from Rockaway beach, southerly by the Atlantic ocean, westerly by the inlet that separates it from Plumb beach, and northerly by a narrow creek that separates it from the Marsh lying south of the said town of Flatlands, shall be, and the same is hereby annexed to the aforesaid town of Flatlands."

This description, supplemented by the characterization of the narrow creek as the Indian creek, is the one that was thereafter substantially followed by the deeds of the island, including the partition deed of 1835.

That Barren Island was the term applied from the earliest times to the present to the single restricted island is evidenced by the description of the Labadists of 1679; Elbertson's adjudication of title to such an island; the description of Moore in 1762 of a single restricted island; the annexation act of 1802 describing it; the proof of all maps from 1827 to the present, showing Barren Island to be the most southerly island of the broken lands, and the opinions in 1883 of Judge ANDREWS in *Coleman* v. *Manhattan Beach Imp. Co.* (94 N. Y. 229, 233) and of Judge CULLEN in *Morton* v. *Manhattan*

*Beach Imp. Co.* (29 Hun, 266, 267). In addition, the appellant Gerritsen Basin Development Corporation's own witnesses, Lott and Whitcomb, descendants of Johannes H. Lott, son of Hendrick, testified that " Indian creek " was the body of water immediately north of the restricted island, Barren Island, which it bounds.

The claim of Gerritsen Basin Development Corporation to all of the broken lands north of Barren Island arises from the two most westerly subdivisions of the 1835 partition to Shaw and Hendrick Lott, and Gerritsen Basin Development Corporation arrives at the claim by extending the lines or bounds of the Barren Island property in a northerly direction. Such extension, primarily because of the angled easterly line of Hendrick Lott, would have resulted in the acquisition of the vast portion of the claimed premises to the exclusion of the three other partitioners, even though allowance may be made for subsequent erosion in the region known as Little bay. These subdivisions were only two of the ten set out.

In 1874 title to these subdivisions was merged in the six children and one grandchild of Johannes H. Lott, son of Hendrick. In 1887 a map made by one Charles Crooke entitled " Map of Land of Henry D. Lott and others situate on Barren Island " shows a portion of the restricted island with Indian creek shown thereon as the body of water immediately north thereof. This area, comprising the two most westerly subdivisions acquired from the 1835 partition, was partitioned by the seven heirs of Johannes H. Lott on the 14th day of July, 1887, and admittedly concerned itself with Barren Island only. It was not until 1897 that these heirs awakened to the possibility that they were vested with an interest in the lands north of Barren Island to the mainland and, in that year, they conveyed a tenth interest to one Gescheidt of the broken lands with the exception of the Barren Island tract, which was partitioned in 1887.

We have examined the proof as to acts of proprietorship by the Lott heirs and their representatives, on the one hand, and the town of Flatlands and the respondent on the other, and find nothing which would establish in either a title acquired by adverse possession and user, assuming that either of the parties claims such title, which we do not understand to be the fact.

The appellant Gerritsen Basin Development Corporation secured by quitclaim deeds the interest in the claimed premises of the Lott heirs and of Gescheidt. These deeds are significant as showing the understanding of the parties as to the meaning of Indian creek as being the creek immediately north of Barren Island and not synonymous with Mill creek or the waterway separating the mainland from the broken lands, and were apparently prepared and

executed before this appellant evolved the theory which it presents on this appeal. Thus, in the deed from the representative of the estate of Henry De Witt Lott to Gerritsen Basin Development Corporation, the land quitclaimed is between Mill creek, Little Flat creek, and Big Flat creek on the north, and on the south " by Indian creek as shown upon ' Map of land of Henry D. Lott and others, situated on Barren Island — surveyed May 1887 by Charles Crooke.' " The deed from George B. Lott to Gerritsen Basin Development Corporation bounds the claimed premises on the south by ". Indian Creek and Deep Creek and Barren Island."

We are in agreement with the disposition by the learned Special Term justice of the claim of the appellant, Thomas F. White Company. The damage parcels which this appellant claims consist of islands and lands under water lying in or about the entrance or junction of Duelys creek, Deep creek and Factory creek. In 1879 title to the portion of Barren Island west of Duelys creek and the line therefrom south to the ocean, which was not the subject of partition in 1835, was acquired in a partition action by Thomas F. White and Andrew J. White by deed from Henry Snell, referee, dated the 16th day of December, 1879. The appellant Thomas F. White Company, as successor in interest, claims that Indian creek, which was the given northerly boundary in the 1835 deed, was what is now known as Deep creek, which lies to the north of the islands in question, rather than Factory creek, which lies to the south thereof; so that, if Deep creek is considered to be Indian creek, then the islands are within the bounds of Barren Island as described, and belong to it under this partition deed of 1879. Regardless of the identity of Indian creek, these islands never comprised part of Barren Island, as that island was commonly understood. Furthermore, we have the testimony of Lott and Whitcomb that Indian creek was the creek immediately north of Barren Island and, according to Lott, the creek on which his lot fronted. The annexation act of 1802 describes Indian creek as " a narrow creek." A map annexed to the judgment roll in the partition action of 1879 undoubtedly serves to show the extent of the lands embraced in that action and does not show those islands, although they were in existence.

The conclusions at which we have arrived are:

I. That the damage parcels are included within lands embraced by the Hudde and Gerritsen patent.

II. That the partition of 1835 was of Barren Island in the sense of a single, southerly island, and the partition did not extend to include the broken lands that lie between that island and the mainland.

III. That, with certain possible exceptions, the successors in interest of Elbert Elbertson down to 1835 did not have any title to the broken lands, other than Barren Island, by reason of the failure of their grantors to include such lands in their conveyances, which were restricted to Barren Island.

IV. That the damage parcels to which appellant Thomas F. White Company claims title were not included in the Snell deed, which is the source of title of the White Company.

These conclusions lead us to a determination that neither of the appellants has shown title to the damage parcels which they claim. In that light, the judgment should be affirmed, as the appellants have no standing to question the respondent's title, the amount of the awards or the propriety of making awards and consequent assessments based upon loss of riparian rights appurtenant to properties not actually taken.

The final decree should be affirmed, with costs.

LAZANSKY, P. J., YOUNG and JOHNSTON, JJ., concur; CARSWELL, J., concurs in result.

Final decree unanimously affirmed, with costs.