In the Matter of the Application of THE CITY OF NEW YORK, etc., Relative to Acquiring Title to Real Property, etc., Situated on the Southwesterly Side of Jamaica Bay, etc., Borough of Brooklyn.

GERRITSEN BASIN DEVELOPMENT CORPORATION, JOHN VANDERVEER, J. DUFFIELD PRINCE, etc., HENRY D. LOTT, etc., and HARRIET S. LOTT, etc., Claimants, Appellants; THE CITY OF NEW YORK, Petitioner, Respondent.

(Jamaica Bay Proceeding No. 1.)

In the Matter of the Application of THE CITY OF NEW YORK, Acting by and through the Commissioner of Docks, Relative to Acquiring Title to Lands, etc., Situated on the Southwesterly Side of Jamaica Bay, etc.

HELENA K. WYETH and Others, Claimants, Appellants; THE CITY OF NEW YORK, Petitioner, Respondent.

(Jamaica Bay Proceeding No. 1.)

In the Matter of the Application of THE CITY OF NEW YORK, etc., Relative to Acquiring Title to Real Property, etc., Being Part of Oraboss and Bushes Meadows, etc., Borough of Brooklyn.

GERRITSEN BASIN DEVELOPMENT CORPORATION, Claimant, Appellant; THE CITY OF NEW YORK, Petitioner, Respondent.

(Jamaica Bay Proceeding No. 2.)

In the Matter of the Application of THE CITY OF NEW YORK, Acting by and through the Commissioner of Docks, Relative to Acquiring Title to Lands, etc., Forming Part of Oraboss Meadows and Bushes Meadows, etc.

HELENA K. WYETH and Others, Claimants, Appellants; THE CITY OF NEW YORK, Petitioner, Respondent.

(Jamaica Bay Proceeding No. 2.)

In the Matter of Acquiring Title by THE CITY OF NEW YORK to Certain Lands, etc., on the Southerly Side of Marine 15th Street, etc., for Park Purposes, in the Borough of Brooklyn, as an Addition to Marine Park.

GERRITSEN BASIN DEVELOPMENT CORPORATION, TIDEWATER INVESTING CORPORATION and TRISTRAM W. METCALFE, Claimants, Appellants; THE CITY OF NEW YORK, Petitioner, Respondent.

(Addition to Marine Park Proceeding.)

In the Matter of Acquiring Title by THE CITY OF NEW YORK to the Area Bounded by Marine 15th Street, etc., for Park Purposes in Connection with the Development of Marine Park, in the Borough of Brooklyn, etc.

HELENA K. WYETH and Others, Claimants, Appellants; THE CITY OF NEW YORK, Petitioner, Respondent.
(Addition to Marine Park Proceeding.)

Second Department, December 11, 1939.

*Ralph L. Baldwin,* for the claimants Gerritsen Basin Development Corporation and others.

*Bernard Cowen,* for the claimants Helena K. Wyeth and others.

*Ernest G. Metcalfe,* for the claimant Tristram W. Metcalfe.

*William C. Chanler, Corporation Counsel* [*Paxton Blair, Joseph F. Mulqueen, Jr., George S. Parsons, Philip L. Wellens* and *Herman Meltzer* with him on the brief], for the respondent.

CLOSE, J.   These are three condemnation proceedings involving land in the vicinity of Jamaica Bay.   The three cases are concerned with the same basic issues, and were tried and decided together. These issues were the subject of prolonged study by this court in a previous proceeding to condemn lands in the same area.   (*Matter of City of N. Y.* [*Gerritsen Marine Park*], 248 App. Div. 240; affd., 275 N. Y. 456.)   In the present proceedings the whole subject is reopened.

The lands involved in all these proceedings lie in southern Brooklyn between the Gravesend section on the west and Jamaica Bay on the east, and consist chiefly of a number of low islands extending from the mainland to and including the most southerly of the group, Barren Island.   Since 1923 the city of New York has been acquiring land in this area, partly for the construction of a marine park and partly for the improvement of the water front.   Lands taken for the first of these purposes were and are the subject-matter of the Gerritsen Creek Marine Park proceeding cited above and of the last-named of the three proceedings now before us.   The acquisition of lands for the second purpose gave rise to the two remaining proceedings.

Title to the lands in question is the issue.   The appellants assert a title originating in a grant made in 1636 by the Dutch Colonial Governor Van Twiller and the Council of New Netherlands to Andreas Hudde and Wolphert Gerritsen.   The city denies that the 1636 grant included the lands involved here, and claims title in itself by virtue of a patent granted to the town of Flatlands in 1667 and grants by the State of New York in 1909 and 1912. In the former proceeding the trial court held that the Hudde and Gerritsen grant did not include the disputed lands.   On appeal this court expressed the opinion, on the record then before it, that the lands were included in the grant, but the decree was affirmed on the ground that the claimants had failed to prove the devolution of title to themselves.   (248 App. Div. 240.)   The Court of Appeals affirmed " because of the failure of the claimants to clearly establish their title to the land in question," and added that it did not pass upon the disputed boundary of the Hudde and Gerritsen grant. (275 N. Y. 456.)   In the present proceedings the trial court has held, contrary to the opinion expressed by this court in the prior

case, that the disputed lands were not included in the original grant. New theories and new evidence account for the reluctance of the trial judge to adopt the conclusion of the Appellate Division in the earlier proceeding as to the extent of the early grant. The issue is not *res judicata*, because the lands directly affected by the former decision were different (*Matter of City of New York [Jamaica Bay]*, 250 App. Div. 124), and for the further reason that the estoppel of the former decree is limited to the point actually determined. (*Schuylkill Fuel Corp.* v. *Nieberg Realty Corp.*, 250 N. Y. 304.)

The area in dispute includes a considerable number of islands lying off the mainland and bounded by Jamaica Bay, the ocean, Gerritsen's creek and Mill creek. Except for Bergen's Island and Barren Island, they consist of low-lying marsh land, uninhabited for the most part and unimproved except for a few shacks erected on piles. Adopting the name appearing on an ancient map, the area has been referred to in these proceedings as the " broken lands." The city denies that the Hudde and Gerritsen grant included any part of such lands. The parties agree that the northerly boundary of the lands conveyed to Hudde and Gerritsen in 1636 was the southerly line of the town of Flatbush; that the westerly boundary was the line of the town of Gravesend; and that the northeasterly and easterly boundary was Bedford creek, also known and designated on some of the maps as " bestafather's Kill," " Bestaver's Kill " and " the Paerdegat." The south boundary is the one in dispute. In the former proceeding the city claimed that this boundary was a line running westerly across the mainland from the mouth of Bedford creek, and excluding not only all the broken lands but also the large tongue of land between Gerritsen's creek and Mill creek designated on Beer's Map of 1873 as " Baes Jurians Hook." The city now concedes that Baes Jurians Hook was included in the patent of 1636 and asserts that Mill creek formed the entire southerly boundary. This version, of course, still excludes the broken lands.

The original of the grant to Hudde and Gerritsen, dated June 16, 1636, is not in existence, but what purports to be a copy, written in Dutch and made simultaneously with the original, appears in a book of Colonial manuscripts on file in the New York State Library. Several English translations are extant, some of which contain variations which at first glance appear to be of minor importance. In the former proceeding all but one of these English versions were introduced in evidence, and apparently no one paid very much attention to, or saw any significance in, the slight differences in the context. Both parties seemed content to accept,

and this court, therefore, adopted, a translation, recorded in the office of the Secretary of State in a book of translations of Dutch Colonial patents. Using that translation as a basis, this court held that the Hudde and Gerritsen grant included all the broken lands.

In the present proceedings the city undertook to show that that translation was incorrect in important particulars and that a proper translation would lead to a contrary conclusion. In addition to introducing again the various translations which were before the court in the prior proceeding, the city produced as a witness Mr. Arnold J. F. van Laer, Archivist of the University of the State of New York, who has had extensive experience in translating and editing the early Dutch records of the State. Through this witness the city introduced a translation which was not in evidence in the former. proceeding, but which was apparently discovered later in a volume of Colonial Documents in the State Library. Mr. van Laer testified that this was the correct translation. It cannot be said that this translation was a new one, for it accords substantially with several of the other versions which were received in the former proceeding. What is new, however, is the expert testimony that this version alone is an accurate translation of the Dutch patent, and that the translation accepted by the court in the Gerritsen Creek Marine Park case was erroneous and vitally misleading.

The van Laer translation of the description in the patent reads as follows: " the westernmost of the 3 flats called Kestateuw belonging to them situated on the island called Sewanhacky between the bay of the North River and the East river of New Netherland, *stretching in length from* a certain kil coming from the sea almost north into the woods and in width from a certain valley, included, almost west also into the woods." A comparison between this interpretation of the patent and that accepted by the court in its former opinion discloses three main differences: (1) The plural word " Bays " becomes the singular " bay;" (2) " extending the length of a certain Kill " is changed to " stretching in length from a certain kil;" and (3) the valley is " included " rather than " inclining."

There can be very little doubt that the van Laer translation of the Hudde and Gerritsen patent is the correct one. It is supported not only by the testimony of van Laer himself, but also by most of the other renditions which were introduced in evidence. A confirmatory patent made by the English Governor Nicolls in 1667 is substantially in accord, except for a single interpolation which will be mentioned hereinafter. Likewise in accord is a translation found among the records of the town of Flatlands filed in the office

of the commissioner of records of Kings county. There is also a copy of the patent written in Dutch with the English translation interlineated, made by Teunis G. Bergen, a historian and geneologist of Kings county, which was obtained from the New York Public Library. The Bergen translation agrees with that of van Laer except that the former renders the word " incluys " to mean " inclining " (as in the version accepted in the last proceeding) rather than " included." The translation from the office of the Secretary of State stands alone in the use of the plural " Bays," and in the phrase " extending the length of a certain Kill." The van Laer translation is, therefore, supported by the great weight of the evidence and should be accepted. The question is whether it should lead us to a conclusion different from that reached in the former proceeding.

Of the three chief differences in translation, which have been pointed out above, the first and third are not of sufficient importance to justify a different construction of the patent; for the " bay " is merely a means of locating the " island called Sewanhacky " (Long Island), and the inclusion of the valley, which is conceded to mean the valley of Bestaver's kill, is not material to the present issue. But the second of the three changes in translation is highly significant. It now appears that the land was described as " stretching in length *from* a certain kil coming from the sea almost north into the woods," instead of " extending the length *of* a certain Kill coming from the Sea the most part Northerly till to the woods." The chief difference is in the translation of the Dutch word " van," which in the latter version (accepted in the prior proceeding) is taken to mean " of," while in the van Laer translation it is rendered as " from." This portion of the description forms the basis of the city's contention that Mill creek was the intended southerly boundary. The witness van Laer reasoned that the intention was to indicate certain land stretching north from a kill; that to locate such land it is first necessary to find a kill running east and west; and that the kill running most nearly east and west is Mill creek.

In my opinion this is the proper construction of the patent. As in the former proceeding, the first problem is to locate the " certain kil coming from the sea." We held in our previous opinion that this kill was the Strom kill (now Gerritsen's creek). But the city, abandoning its former contention that the kill thereby intended was Bestaver's kill lying far to the east, now points out that the kill to the west of the patented lands has two branches. The westerly branch is the Strom kill proper. The easterly branch is Mill creek. Both have a common mouth into the sea. Since

the kill is not named in the patent, a choice must be made between these two branches. In making that choice the van Laer translation of the description is decisive. We must look for a flat which stretches northerly from a kill. There can be no such land running north from the Strom kill, which itself runs almost directly north. But Mill creek, according to the Hubbard Map of 1666, ran nearly east and west, and there is no difficulty in locating the land stretching to the north from that creek.

This construction solves most of the difficulties arising out of the construction of the Hudde and Gerritsen patent. It furnishes the grant with a southerly boundary, which otherwise is lacking and left wholly to conjecture. It produces a tract of land having four fixed limits from Mill creek on the south to the woods on the north, and from the valley on the east to the woods on the west. The conclusion now reached is also in accord with other language appearing in the description. It is significant that the land was described as " situated on the island called Sewanhacky," *i. e.*, on Long Island. Certainly a conveyance of land on a named island can only with difficulty be construed as including other islands. This is particularly true when we consider that some at least of the other islands bore separate names. Bergen's Island was known as Meutelaer's Island at least as early as 1646, and Barren Island was known to the Indians as " Equindito." It will be noted too that the only land conveyed to Hudde and Gerritsen was a " flat " with an adjoining valley. This on its face excludes the notion that great offshore islands were included in the grant.

With Mill creek as the southerly boundary and the broken lands excluded from the patent, facts and circumstances which would otherwise remain obscure or unexplainable are clarified. It is claimed by appellants that Bergen's Island was included in the patent of 1636. Yet it appears that in 1646 the Dutch Governor Kieft conveyed Bergen's Island to one Onderhil. This indicates that the Dutch Governor and Onderhil at least were of opinion that Bergen's Island was not a part of the land granted by the earlier patent. In 1652 certain Indians joined with Onderhil in a deed conveying the island to Thomas Spicer, and in 1665 it was purchased from the heir of Spicer by Elbert Elbertsen, claimants' alleged predecessor in title to the lands in dispute. It was not until 1666 that Elbertsen received from the Gerritsen heirs his title to the lands embraced within the patent of 1636. This tends to show that Elbertsen did not believe that Gerritsen had ever been the owner of Bergen's Island, for he would scarcely have purchased from the Spicer family if he had believed that Gerritsen or his heirs had title.

Similarly, in 1664 certain Indians gave Samuel Spicer and John Tilton a deed to Barren Island under the name of " Equindito." The description in this deed indicates that the parties thereto considered the Gerritsen lands as lying some distance north of Barren Island. In 1681 Tilton and Spicer conveyed all their right, title and interest in the island to Elbert Elbertsen, thus again indicating that the latter did not consider himself already the owner by virtue of his purchase from the Gerritsen heirs. It may be true, of course, that the Indians who originated this chain of title had no title themselves, but the circumstances are significant evidence of the contemporary understanding of the lands conveyed by the Hudde and Gerritsen patent.

Most important of all, perhaps, is the consistency between the present interpretation of the patent and the statement made in 1651 by the directors of the West India Company, in a letter to Governor Stuyvesant, that Hudde and Gerritsen held " about 1800 morgens " (3,600 acres) of land on Long Island. If the broken lands had been included in the patent the entire area would have amounted to nearly 8,000 acres. Excluding the broken lands the area granted to Hudde and Gerritsen would be 4,065 acres, which is reasonably close to the West India Company's estimate.

The principal obstacle to an acceptance of the present construction of the patent is found in the determination of a board of arbitrators appointed in 1696 to decide a dispute between the town of Flatlands and the heirs of Elbert Elbertsen who had succeeded to the Hudde and Gerritsen title. The arbitrators made a lengthy decision containing findings of fact and conclusions. The decision does not state what lands were in dispute except that they were " Certaine Tracts or parcells of land lying situate and being in the towneship of fflattlands." However, the findings as a whole give rise to the inference that the dispute was concerned with the westerly boundary of the lands conveyed by the Hudde and Gerritsen patent. The arbitrators adopted the description contained in the confirmatory patent from Governor Nicolls in 1667. Their decision contains the following finding: " 2d. We doe find according to our best understanding that by the words above mencond in van Twillers patent (stretching in length from a Certaine Kill or Creeke coming out of the sea, and soe runs almost north into the woodland) is meant only the running of the Creeke almost north, and not to run almost a north line from said Kill or Creeke into the woodland." This finding cannot be reconciled with the theory which we are about to accept that the original patent was intended to indicate land lying north of the kill, for the finding is that the northerly direction referred to the kill itself. A finding of such antiquity should not

be lightly disregarded. Yet there is reason to believe that the arbitrators who made it were themselves misled by an erroneous translation of the patent. The confirmatory grant of 1667, from which the arbitrators took their description, is the only extant translation which interpolates the words " and soe runs " following the reference to the kill. The insertion of these words makes it appear that it was the kill which ran northerly to the woods. Yet if these words are omitted the northerly direction may reasonably be taken to relate back to the " stretching " of the flat from the kill. Under the circumstances the finding of the arbitrators is of such doubtful value that it cannot be allowed to prevail over the evidence supporting a contrary finding.

It would not be profitable to undertake a detailed discussion of the numerous other items of evidence contained in the large record before us. Such evidence is for the most part so uncertain that contrary inferences can be drawn with equal readiness. It is enough to say that we have examined the whole record with great care and have reached the conclusion, on the grounds heretofore stated, that the Hudde and Gerritsen grant did not include the broken lands.

There are a few damage parcels, mostly on Barren Island, which were claimed by certain of the appellants other than the Gerritsen Basin Development Corporation and the Wyeth group, the title to which was not in dispute. Awards which are claimed to be inadequate were made for these parcels. The parcels in question are those numbered 2, 2-A, 4, 6, 7, 10 and 11 in the Jamaica Bay Proceeding No. 1, and those numbered 2 and 16 in the Addition to Marine Park proceeding. As to all of these, except Damage Parcel No. 2 in the last-named proceeding, we are satisfied that there is adequate evidence to support the awards made at Special Term and that the awards should stand. (*Matter of City of New York* [*Neptune & Emmons Avenues*], 254 App. Div. 690; affd., 280 N. Y. 604.) The award of $1,550 for Damage Parcel No. 2 in the Addition to Marine Park proceeding, owned by the appellant Metcalfe, is so clearly wrong as to shock the conscience of the court. The sum awarded is substantially less than the amount of an assessment for benefit imposed upon the same parcel in 1932 in a previous condemnation proceeding, in spite of a provision in section 1001 of the Greater New York Charter forbidding an assessment exceeding one-half the value of the property. The award for this parcel should be increased to the sum of $3,940.

The final decrees in the Jamaica Bay Proceeding No. 1 and Jamaica Bay Proceeding No. 2 should be affirmed, with costs.

The final decree in the Addition to Marine Park Proceeding should be modified by increasing the amount of the award for the Metcalfe parcel (Damage Parcel No. 2) to the sum of $3,940, and, as thus modified, the decree should be affirmed, without costs.

LAZANSKY, P. J., CARSWELL and TAYLOR, JJ., concur, each in separate opinion; HAGARTY, J., dissents in part, with opinion, and with reference to Damage Parcels 16, 16A, 16B, 19, 21, 21A, 22, 22A, 23, 23A, 24, 24A, 26, 27, 27A, 27B, 28, 29, 30, 31, 31A, 32, 33, 34, 35, 36, 36A, 37, 37A, 38, 38A, 39, 40, 40A, 40B, 41, 41A, 42, 43, 43A, 44, 46, 46A, and 46B in Jamaica Bay Proceeding No. 1; 3, 4, 5, 6 and 8 in Jamaica Bay Proceeding No. 2; and 1, 17, 18 and the land portion of 19, in Addition to Marine Park Proceeding, votes to reverse the decrees as to such parcels and to remit for the taking of proof as to devolution of title and the making of awards in accordance therewith.

LAZANSKY, P. J. (concurring). The conclusion reached by me in this case is in accord with that of Mr. Justice CLOSE that the " Broken Lands " were not included within the patent of 1636, although in *Matter of City of N. Y. (Gerritsen Marine Park)* (248 App. Div. 240) there was concurrence by me in the opinion of Mr. Justice HAGARTY to the contrary. The determination in that case, as pointed out by Mr. Justice CLOSE, is not *res judicata* here and, since there are new material facts, *stare decisis* is not applicable. The change in my views is largely due to the corrected translation of that part of the description in the patent from what was then conceded in the *Gerritsen Marine Park* case (*supra*) to be the correct translation, to wit, " *extending the length* of a certain Kill coming from the Sea the most part Northerly till to the woods," to the present translation " *stretching in length from* a certain kil coming from the sea almost north into the woods * * *." The translation, accepted by all in the *Gerritsen Marine Park* case (*supra*), fortified as it was by the description in the Nicolls confirmatory patent of 1667 and the finding in the arbitration of 1696, both then deemed to be accurate, readily invited the view that the westerly bounds was the Strom kill from the sea north and, therefore, tended to justify the inference that the ocean was the southerly boundary of the land granted by the patent. This meant, of course, as urged by claimants, that the lands in dispute were within the patent of 1636.

But the corrected translation sets a new face on the situation. This new translation, to wit, " stretching in *length from a certain kil coming from the sea* almost north into the woods and in width from a certain valley, included, almost west also into the woods "

suggests to me a construction different from the one outlined by Mr. Justice CLOSE in his opinion, but with no change in result. "Stretching in length *from* a certain kil coming from the sea * * * " means a "stretching" from some part of, or place on, the kill that comes from the sea. What part of, or place on, the kill is not stated. The "kil coming from the sea" describes the kill, but does not mean that the boundary starts from the sea whence comes the kill. There is nothing in this part of the description which indicates a definite place of beginning. But an inference as to where the place of beginning was may be made from the remainder of the description "in width from a certain valley, included, almost west also into the woods." These words not only indicate the width, but also the eastern boundary. Upon the conceded facts, the southernmost part of the valley was directly north of the head of what is now known as Mill creek, and thence the valley runs along the side of Bestafather's kill. "Almost west also into the woods" describes land which is also north of Mill creek. There is no description of width south of Mill creek. If the width of the land granted was entirely north of Mill creek, then the length must have begun north of Mill creek stretching "almost north into the woods." The Hubbard map, though crude, made ten years after the patent, shows Mill creek running about east and west and joining the Strom kill on the west. Since a place on what is conceded to be the Strom kill is where the stretching begins, and the entire width is north of Mill creek, and the valley begins on the north side of and about at Mill creek, it may be fairly said that the "stretching in length from a certain kil coming from the sea almost north into the woods" meant that the length of the grant was measured from where the Strom kill meets Mill creek and thence "almost north into the woods," meaning probably the direction of the Strom kill. From all this it may be inferred that the width on the south was from a place where the Strom kill and Mill creek meet over to the valley or Bestafather's kill, and that the length was from between those points on Mill creek "almost north into the woods." Thus Mill creek was the southerly boundary. Of course, this is not by any means conclusive, nor completely convincing. But it does give a sensible interpretation to a description obscured by its sparseness.

That Mill creek was intended as the southerly boundary and that no part of the grant extended below that creek is also strongly indicated by (1) the absence of any boundary to the east below the valley, which means below Mill creek, although Hubbard's map shows a five-mile stretch from Mill creek south to the ocean, consisting of sand hills and Canarsie Bay on the east; and (2)

the failure expressly to name the ocean as the southerly boundary. In this connection it may be noted that in the patents to Gravesend adjoining to the west, the main " ocean sea " is given as the southerly boundary.

Although my colleague, Mr. Justice CLOSE, has written an extensive opinion, I take the liberty of making several additional observations in connection with items which have a different significance in light of the new translation and tend to support the conclusion reached by him.

Reference is made by Mr. Justice CLOSE to the grant of Bergen's Island by Governor Kieft to Onderhil and by the Indians and Onderhil to Spicer and by Spicer's heir to Elbertsen in 1665. Although the arbitration of 1696 indicated that the westerly bounds of the early grant was the Strom kill beginning at the sea, from which it was inferred that the " Broken Lands " were included in the original patent, the arbitrators, nevertheless, found the patent from the Dutch Governor Kieft to Onderhil of Mutelar's Island (Bergen's Island) and conveyed by Onderhil to Elbertsen. There was no reference to the early Dutch grant in this connection. Bergen's Island, according to the description in the Kieft patent, was two creeks from Long Island, therefore, a part of what is called the " Broken Lands." A recognition of this patent by the arbitrators, it seems to me, is inconsistent with a holding that the " Broken Lands " were included in the early Dutch grant. It tends to support the view of Mr. Justice CLOSE that the early Dutch grant did not go below Mill creek.

The description of Barren Island, also called the " Broken Lands," conveyed by the Indians to Tilton and Spicer is not without significance. It is as follows: " a Certain Island, commonly called by the Indians Equindito; And by the English the broken Lands lying and being near Unto the Westermost End of Long Island, and to the Southside thereof, And for the most part Inviorined with the Main Ocean Sea, which on the westermost part thereof branches itself into a river running Northerly, that is to say, to the land sometime belonging to Hugh Garratson, And allso into a river run running Easterly." It thus appears that the " Broken Lands " were surrounded for the most part with the " Main Ocean." This includes the south side and the east side. On the west is a river running northerly, i. e., Strom kill, and on the north is a river running easterly (Mill creek). It also appears that the river running northerly goes to the land " sometime belonging to Hugh Garratson." I assume that this is one of the Gerritsen family, through whom the original Dutch patent comes. It thus seems that the Strom kill ran up to Garratson's land and thence ran easterly a river which also was a branch of the ocean. This

suggests that Garratson's land did not begin at the ocean. It also tends to support the view expressed by Mr. Justice CLOSE that there were two branches of the " kil coming from the sea."

In the Nicolls patent to the Flatlands freeholders of 1667 there is a description difficult to follow and understand, a part of which is as follows: " from their Westerne Bounds wch begins at a Certaine Creek or Kill comonly called ye stromme Kill they Stretch to ffirkins or varckens Hook." On Hubbard's map there is a part outlined in red indicating the boundaries of the grant which claimants assert was made under the original Dutch patent. Outside of these red lines to the east thereof and to the east of Bestafather's kill will be found the words " Varkin's Hook." From this part of the description and from a general understanding of the balance thereof, it is fair to infer that this grant to Flatlands was north of Mill creek and did not include the " Broken Lands." In this grant to Flatlands, as in the original Dutch patent, there were no bounds by the ocean. The ocean is not mentioned. It is hardly likely that two such large islands would be included within the words " Together wth all Havens Harbours Creekes Quarryes woodlands Meadow Ground Reedland or Valley of all Sorts Pastures Marshes Waters Rivers Lakes fishing hawking hunting & fowling & all other profitts Comodityes Emolumts & Hereditamts to ye said Lands & prmisses wthin ye said Bounds & Lymitts sett forth belonging or in any wise apperteyning," as is claimed by appellants.

There are a number of items upon which appellants may call to sustain their view. The Dongan grant of 1685 indicates that the ocean was the southern boundary of Flatlands, which seems to be presently conceded. The various grants of Gravesend were made, all of which were bounded on the south by the ocean. In the arbitration of 1696 it was found that the western boundary of Elbertsen's land, granted by Governor Nicolls in confirmation of his purchase from Gerritsen growing out of the original Dutch grant, joins to the easternmost part of the Gravesend town patent which ran to the ocean. In the Nicolls patent of 1667, the description was followed by the words " TOGETHER with all the lands, Soyles, Woods, Meadows, fflats, Pastures, Marshes, Creekes, Waters, Lakes, ffishing, Hawking, Hunting and ffowling, And all other profits, Commodities, Emoulments, and hereditaments to the said Parcell or Tract of land & premises belonging or in anywise, appertaining with their and every of their Appurtenances and of every part and parcell thereof." This it is said, refers to the " Broken Lands " and, at least, indicates what it was thought that the original Dutch patent granted. It will be remembered

that in 1664 the Indians conveyed Barren Island or the " Broken Lands " to Tilton and Spicer and that an heir of Spicer conveyed to Elbertsen in 1681. It appears that in 1679 Elbertsen claimed title to the island in an action which he brought for trespass. There are also some other items which, appellants argue, indicate that the " Broken Lands " were included within the original grant. However, whatever doubt may be thrown on the conclusion reached by the trial court by reason of these various items submitted by appellants, they are not sufficient to overcome the construction placed upon the original patent adopted by the trial court, starting with the corrected description as a basis.

CARSWELL, J. (concurring). When this case was here before I did not concur in the opinion of the court. I merely concurred in the result, which is not controlling on the question now presented. I concur in the opinion of Mr. Justice CLOSE, with these observations:

(a) The basic conclusion of Special Term is reinforced by the rule of strict construction applicable here. A patent or a grant from a sovereign to a subject is to be construed strictly in favor of the Crown. A different rule prevails where the grant is to a town or a political subdivision. (*People* v. *Foote*, 242 App. Div. 162; 273 N. Y. 629; certiorari denied, 302 U. S. 760.) The rule in respect to grants between private parties is that ambiguity or doubt as to meaning is to be resolved in favor of the grantee. (2 Tiffany, Real Property [2d ed.], § 437, p. 1618; *Allen* v. *Trustees of Great Neck Free Church*, 240 App. Div. 206; affd., 265 N. Y. 570.) Likewise a grant by a sovereign to a subject or private person based upon a real or adequate consideration requires ambiguity to be resolved in favor of the grantee.

(b) That basic conclusion is further reinforced and buttressed by the rule of repose (*Beers* v. *Hotchkiss*, 256 N. Y. 41, 48; *People* v. *Foote, supra*) applicable to the resolving of disputes as to interpretations of old grants, that " courts do not look at records with over-technical eyes after the healing acquiescence " of centuries. The " rule of repose " is not in conflict with the principle that there can be no abandonment of title — in fact it is wholly compatible with that principle. The rule here acts upon and presupposes a situation where contemporaneous or early interpretations of original grants resulted in a course of action or inaction, equivalent to a practical construction of the grant, which recognizes that there never was title in respect of the parcel in controversy in the one under whom a claim of title is belatedly asserted. This is a far cry from abandonment of title. It is a mere recognition that there

never was any title to abandon. The existence of the principle that there can be no abandonment of title does not militate against the existence of the " rule of repose " which has long been recognized. (*Beers* v. *Hotchkiss, supra; People* v. *Foote, supra.*)

TAYLOR, J. (concurring). In relation to the claims to awards, of the appellant Gerritsen Basin Development Corporation, for real property taken within the confines of the so-called " broken lands," which claims are based upon that appellant's contention that the Dutch grant of 1636 included such " broken lands," I am of opinion that the following additional considerations fortify the conclusion of my brother CLOSE that such grant did *not* include those lands but did include only a " flat " on the mainland of Long Island. It did not include the marshy islands and land under water constituting the broken lands lying between the mainland and the ocean on the south. Such a grant must be construed strictly against the grantee. (*People* v. *Foote*, 242 App. Div. 162; 273 N. Y. 629; certiorari denied, 302 U. S. 760.) Thus construed, the land conveyed is on Long Island only. Further, the Dutch grant is in effect an ambiguous contract as far as the description therein is concerned. Practical construction of that contract by the parties thereto and their successors in title or interest, as shown by their acts or omissions in relation to the real property, aids in the interpretation of the description in the grant. The conduct of the said appellants' alleged predecessors in title, as disclosed in the record, for an impressively long period of time — nearly 300 years — shows that they recognized that the land conveyed in the grant was mainland only. " The practical interpretation of an agreement by a party to it is always a consideration of great weight. * * * There is no surer way to find out what parties meant, than to see what they have done." (*Insurance Co.* v. *Dutcher*, 95 U. S. 269, 273; *vide* also *Zimmermann* v. *Roessler & Hasslacher Chemical Co.*, 246 App. Div. 306, 315; affd., 272 N. Y. 566.)

HAGARTY, J. (dissenting). I dissent in part and as to the following damage parcels: 16, 16-A, 16-B, 19, 21, 21-A, 22, 22-A, 23, 23-A, 24, 24-A, 26, 27, 27-A, 27-B, 28, 29, 30, 31, 31-A, 32, 33, 34, 35, 36, 36-A, 37, 37-A, 38, 38-A, 39, 40, 40-A, 40-B, 41, 41-A, 42, 43, 43-A, 44, 46, 46-A and 46-B in Jamaica Bay Proceeding No. 1; 3, 4, 5, 6 and 8 in Jamaica Bay Proceeding No. 2; and 1, 17, 18 and the land portion of 19, in Addition to Marine Park proceeding, and vote to reverse the decrees as to such parcels and to remit for the taking of proof as to devolution of title and the making of awards in accordance therewith.

The only important differences between these proceedings and the former one (*Matter of City of N. Y.* [*Gerritsen Marine Park*], 248 App. Div. 240; affd., 275 N. Y. 456) are that the respondent now admits that which it previously denied and challenged, namely, that the Strom kill was the kill coming from the sea described in the Hudde and Gerritsen patent, and that the scope of that patent included the land running along the easterly side of that kill which is known as Baes Jurians Hook. My colleagues are of opinion that a changed translation of the wording of the description of the patent and a construction to be placed thereupon require a conclusion that the southerly boundary of the patent was not the ocean but Mill creek. I am of opinion that the change in translation, even if accepted, is not only immaterial, but indicates just as clearly that the southerly boundary was the ocean. The word " van " in the description may be translated either as " of " or " from." It is used four times in the same description other than at the disputed place and, in three of those instances, it is admitted that the correct translation is " of." If it means " of," the language of the patent is translated to refer to the land as extending the length of a kill which comes from the sea and continues almost northerly into the woods. If it means " from," the patent may be read as relating to land stretching in length almost northerly from a kill coming from the sea. In either case, the plain meaning of this patent is that its length is measured from the kill as it comes from the sea. A different holding involves rejection of all the proof adduced. It is necessary to ignore the fact that the kill comes from the sea and necessarily continues in a northerly direction, and to place the kill, admittedly the Strom kill, in an easterly and westerly direction beyond and to the north of the broken lands. Mill creek fulfills this requirement in so far as it is portrayed on the Hubbard map as running easterly and westerly to the north of the broken lands, but it is not, nor was it ever, regarded as the Strom kill, the kill coming from the sea. The Strom kill is a broad, well-defined watercourse which, at the time of the patent, had its mouth at the ocean and, at the present time, east of Rockaway Inlet, due to accretion of the peninsula to the south. It runs northerly or almost so and terminated, at the time of the patent, in the vicinity of Kings highway, or near the woods of Gravesend referred to in the patent. It is so depicted on every map in the record, inclusive of the Hubbard map of 1666 and the Beers map of 1873, which latter is admitted to be correct by all parties. This is the watercourse which is referred to as a boundary line by numerous town patents, e. g., the Dongan patent to Gravesend of 1686 reading " and from thence Running A Long the hollow to

the head of a Certaine Creeke, Commonly Called and knowne by the name of the Strom Kill, or Hugh Garresttsen Creeke, and a Long the Said Creeke to the maine Ocean." There is not a shred of proof in this entire voluminous record that Mill creek was ever known as the Strom kill or as a branch of it. In the light of this overwhelming and uncontradicted showing, I am unable to reject the findings of the arbitrators of the 1696 proceeding, outstanding men of the community, who recognized the Strom kill as the watercourse it is undeniably shown to be, as the kill referred to in the patent and as the kill which the patent contemplated as extending almost northerly to the woods, and to accept instead the theory of the present day translator who " only had a comparatively short time to look into this thing." The findings of the arbitrators in these respects were not even questions at issue, but were accepted and acknowledged as facts, apparently with the acquiescence of all concerned, as premises leading to the conclusion reached. The principal difficulty in seeking to exclude the broken lands from the scope of the patent is the effort to find something in the description which limits or qualifies the length of the Strom kill as it comes from the sea. The absence thereof renders the differences in the translations immaterial and accounts for the acceptance of both as meaning the same thing.

It would serve no useful purpose to review all the pertinent proof, in the light of the able and painstaking opinions of my colleagues and of the learned Special Term justice, as well as the opinion written for this court when the same question was presented in the former proceeding. (*Matter of City of N. Y.* [*Gerritsen Marine Park*], *supra.*) There are, however, a number of conceptions of the proof and deductions therefrom, influencing the majority of this court in arriving at their conclusion on the present appeal, with which I cannot agree and to which attention should be directed.

The source of title to Barren Island, which island fronted on the ocean, is a most important factor. Without proof, and notwithstanding the language of the Equindito deed of 1664, it seems to be accepted as a fact that that deed purported to convey title only to Barren Island. On the former trial, Mr. Clark, for the respondent, was of opinion that the deed was to the broken lands. The deed itself says so. That the broken lands, in the aggregate, were considered as an " island " is evident from the Hubbard map showing them as such. No patent was ever granted in connection with the Equindito deed, and I do not understand that the majority of this court have found, or that the city contends, that it was efficacious as a source of title, although it is urged as an offset to the claim that the source of title to Barren Island was the

Hudde and Gerritsen patent. This deed, made at the time of the English invasion, might have served as a basis for an English patent in the event that the existing Dutch patents were revoked by the new rulers. Instead, the Dutch patents were confirmed. Elbertsen had acquired his interest from the Gerritsen heirs prior to, and not subsequent to, the Equindito deed. Although Elbertsen's deed is dated 1666, the contract of sale of the remainder of the patented lands, pursuant to which the deed was delivered, was made in 1662, and imports possession in Elbertsen as of that time, it being acknowledged that the heirs had sold and that Elbertsen had bought the property in question. In 1679, an action by the inhabitants of Flatlands against Elbertsen on the ground that the latter made claim to a certain tract of land was decided in favor of the defendant. The court entry immediately following recites that Captain Elbertsen complained that three individuals had trespassed " upon his Island called Bearn Island to his Damage." These entries appeared to me in the former proceeding, and still do, to indicate the existence of cross-actions relating to Barren Island. It would be a most remarkable coincidence that, on the same day and apparently at the same time, two totally different and independent actions relating to trespass, both involving Captain Elbertsen, were before the tribunal. Respondent offers the entire docket of the court for that day showing the disposition of numerous cases in addition to these two. The entries of these two follow each other, however, and the significant fact remains that, although in each and every other case the disposition thereof is noted, there is no notation of the disposition of the complaint by Captain Elbertsen against the named individuals of trespass upon Barren Island, and apparently the verdict of the jury in the action against Elbertsen was determinative of both proceedings. Thus it is reasonably clear that Elbertsen did claim title to Barren Island and that his claim was upheld *two years prior* to the conveyance to him of Equindito in 1681.

The Nicolls patent to Flatlands of 1667 describes the westerly boundary as the Strom kill and the easterly boundary as " ye Mouth of ye Creek or Kill " which is undisputedly stated to be Fresh kill, to the east of Ffirkins hook and having its mouth at Jamaica Bay. The designation of Ffirkins hook in the description is utilized to locate a point of land, but the land of the town " runnes about ye end of ye said Point as well as on ye one syde of it." With the westerly boundary terminating at the ocean and the easterly boundary terminating at Jamaica Bay, I am unable to discern any reason for the belief that lands between these two points, inclusive of the broken lands, were not therein included.

Nor am I able to subscribe to reasoning that the length of the lands within the Hudde and Gerritsen patent should be measured and circumscribed by the width described therein.

I have no doubt that the casual reference in the letter of the West India Company to the effect that Hudde and Gerritsen held about 1,800 morgens of land on Long Island related to the mainland and that the writer did not include these broken and wet lands within his estimate.

The only substantial obstacle to the construction of the patent as inclusive of the broken lands is the Kieft patent of 1646 to Captain Onderhil in return for his services in fighting Indians. Numerous other patents, ostensibly derogatory of the Hudde and Gerritsen patent, of lands within the conceded bounds of the latter were issued. The strictures of the Dutch officials as to speculation and land-selling must be borne in mind with respect to them. Here, too, Elbertsen acquired title from Spicer's heirs subsequent to and not prior to the time that he had acquired his interest in the Hudde and Gerritsen patent. The situation suggests that he deemed it politic to purchase a quitclaim, as he did of Equindito, rather than assert and litigate his own superior title. In contrast, the only demonstrated source of title out of Elbertson to the adjacent Mill Island is the Hudde and Gerritsen patent.

My conclusion is that if the grantors had been sedulous to exclude the broken lands from the bounds of the patent and by means of a southerly boundary consisting of an inland waterway, they would have so stated. I have no doubt that they had no intention of so circumscribing this, the first patent issued of land on Long Island, and that on the contrary they plainly showed by their description that the southerly boundary was the sea, a fact established by an overwhelming preponderance of the extrinsic proof.

Assuming that there was doubt or ambiguity, no satisfactory reason is shown why the confirmatory Nicolls patent of November 1, 1667, should not be taken to mean what it says, namely, that title is confirmed in Elbertsen of all the land included within the patent together with lands " fflats, Pastures, Marshes " and " Creekes;" and in the light of the holding in *Best Renting Co.* v. *City of New York* (248 N. Y. 491), I am of opinion that this language should be accepted at its face value. Here, too, the description shows that the grant was measured by the kill " coming out of the sea *and so* runs almost North into the Woodland * * *." (Italics mine.)

Finally, there is no so-called " rule of repose " with respect to land titles for the reason that there is no such thing as abandonment

of title predicated upon neglect of an estate. (*Matter of City of N. Y. [Realty Associates]*, 256 N. Y. 217.) Nor is it in accordance with the facts to assert that there has been acquiescence or recognition of exclusion of the broken lands from the scope of the patent for 250 or 300 years. In 1745, Wilhelmus Stoothoff conveyed a one-half part of "the Common & undivided Lands, Meadows, flatts, bays, Marshes, beaches, Creeks * * * " of which his father had died seized, by virtue of the patent. By will probated April 19, 1794, Jeromus Lott devised his interest in "the undivided lands and meadows, beaches and marshes," in the patent. In 1897 the Lott heirs conveyed an interest in the broken lands north of Barren Island to Henry M. Gescheidt and invoked the patent, and Gescheidt asserted the claim of these heirs to the broken lands by reason of the patent before the Attorney-General of the State in 1898.

In my opinion, the finding of the trial court that the broken lands were not included within the bounds of the patent should be reversed and as to those damage parcels hereinbefore enumerated the matter should be remitted to the trial court for the taking of proof and determination of the devolution of title and the making of awards in accordance therewith.

Final decrees in the Jamaica Bay Proceeding No. 1 and Jamaica Bay Proceeding No. 2 affirmed, with costs.

Final decree in the Addition to Marine Park Proceeding modified by increasing the amount of the award for the Metcalfe parcel (Damage Parcel No. 2) to the sum of $3,940, and, as thus modified the decree is affirmed, without costs.